COLORADO FLYING ACADEMY, INC., a
Colorado Corporation; Federal Insurance Company, and Associated Aviation
Underwriters, Plaintiffs,

v.

The UNITED STATES of America,
Defendant.

Civ. A. No. 76–K–351.

United States District Court,
D. Colorado.

Jan. 20, 1981.

L. B. Ullstrom, Edward J. Rau, Denver, Colo., for plaintiffs.

James Gatlin, Asst. U. S. Atty., Denver, Colo., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

KANE, District Judge.

### INTRODUCTORY STATEMENT

This action arises out of a mid-air collision between two aircraft over Denver, Colorado. Plaintiffs' aircraft, a twin-engine Piper Seneca, N–774, was struck by a single engine Beech Bonanza, N–27R. All four occupants of the Bonanza died when it crashed into the Crown Hill Cemetery. The pilot and student-pilot aboard the Seneca received only minor injuries after ditching their disabled aircraft in Sloans Lake.

The collision occurred in clear weather, at approximately 9:36 A.M. on June 21, 1974. The Seneca, owned and operated by Colorado Flying Academy, was being flown on an instrument procedures training flight, utilizing the radar and instrument approach facilities operated by defendant at Stapleton International Airport, Denver. At the time of the collision, the Seneca was under the control of a radar approach controller, employed by the Federal Aviation Administration in the air traffic control facility at the Stapleton control tower. The Bonanza, being flown by the owner, a resident of Arizona, was operating under visual flight rules, and had nearly reached its destination airport at Boulder, Colorado, after departing Williams, Arizona, earlier in the day.

Plaintiffs' initial complaint alleging negligence on the part of defendant sought $81,000 money damages for the loss of the Piper Seneca aircraft. Later, the survivors of the deceased occupants of the Bonanza made demand on the plaintiff, Colorado Flying Academy, to pay wrongful death damages totaling $1.3 million. Plaintiff, Colorado Flying Academy, and the insurance company plaintiffs, while denying negligence and claiming that the Federal Aviation Administration was responsible, settled these demands for $390,000. Following this settlement plaintiffs amended their complaint to pray for judgment in the total sum of $471,000, representing the $81,000 aircraft loss and the $390,000 paid to the Bonanza survivors. During the trial, after the testimony of Shields B. Craft, plaintiffs' claims adjuster, the prayer was amended to include $4,621.25 for damages paid to Crown Hill Cemetery, $325.00 for aircraft salvage paid to J. W. Duff, $2,000 medical payments to the heirs of the deceased occupants of the Bonanza, $14,000 for the Bonanza's destruction and $8,751.04 for related attorney fees. No administrative claims were ever filed for these latter amounts.

### JURISDICTION

The Court has jurisdiction pursuant to the Federal Tort Claims Act. The amount in controversy exceeds, exclusive of interest and costs, the sum of TEN THOUSAND DOLLARS ($10,000.00).

## GENERAL NATURE OF THE CLAIMS OF THE PARTIES

1. Plaintiffs claim:

(a) The FAA designed and maintains the Denver Terminal Control Area (TCA) for the sole purpose of separating aircraft and preventing collisions. The FAA designed the Denver TCA in a faulty manner in that the TCA did not cover an area and altitude that would include the Instrument Landing System (ILS) approach, or, conversely, designed and failed to modify the ILS 8R procedure to match the TCA and thus give adequate protection to aircraft under radar control, from conflicting unknown traffic "compressed" under the TCA "shelf."

(b) Plaintiffs' aircraft, on an instrument practice flight under positive radar control, was being vectored by radar by the Denver Tower Approach controller and had been cleared for final approach to landing, thus had the right-of-way over all other aircraft, under Federal Aviation Regulations, 14 CFR § 91.67(f).

(c) The FAA failed to maintain properly the radar equipment employed to provide separation for aircraft.

(d) The FAA failed to direct the plaintiffs' aircraft out of danger and failed to advise the plaintiffs of the fact that the other aircraft was in dangerous proximity although the FAA gave warnings to other aircraft of conflicting non-transponder traffic.

(e) The FAA failed to maintain adequate separation (500 feet vertically) between plaintiffs' aircraft and other conflicting traffic, which traffic was "compressed" in the narrow corridor under the "shelf" of the TCA.

2. The defendant generally denies the allegations of plaintiffs and asserts that plaintiffs fail to state a claim upon which relief can be granted and that as to at least part of plaintiffs' claims the court is without jurisdiction pursuant to the discretionary function and misrepresentation exceptions of the Federal Tort Claims Act, 28 U.S.C. § 2680(a) and (h), particularly with regard to the allegations concerning the establishment and design of the Denver TCA, the establishment of the ILS BC 8R approach to Stapleton Airport, and the issuance of Type Certificates. Defendant further asserts that plaintiffs are not the real parties in interest; that plaintiffs were negligent *per se* or contributorily negligent in failing to see and avoid the aircraft with which its pilot and student collided; and that plaintiffs voluntarily assumed the known risk of harm in operating the aircraft. Defendant further asserts that the plaintiffs are estopped to deny negligence because they entered into a voluntary settlement with the survivors of the deceased occupants of the other aircraft involved in this mid-air collision and further that there is no rule of contribution or indemnity applicable that will permit recovery from defendant of that settlement amount.

## STIPULATIONS

Following conferences between counsel for the parties, held pursuant to the request of the court, the following stipulations were agreed upon and are considered to be facts:

1. That the subject aircraft Seneca 774 was in the control and possession of Colorado Flying Academy, Inc. (hereinafter referred to as CFA); that Brian Gardner was the pilot in command of said aircraft at the time of the accident and that Brian Gardner was acting within the scope and authority of his employment for CFA at the time of the accident. Further, that the aircraft was owned by CFA with a security interest held by Piper Finance Company at the time of the accident.

2. That the weather at the time and place of the accident was as stated in the NTSB accident report, *to wit*: daylight, clear, and visibility 60 miles. Further, that weather was not a contributing cause of the accident.

3. That the FAA was the agency responsible for the design, construction, implementation and establishment of procedures for the Denver Terminal Control Area and for the Instrument Approach Procedures for Stapleton International Airport.

4. That the Transcript by Frank McDermott of Denver Tracon Terminal Radar South, June 21, 1974, 1502–1555 GMT, is a

substantially accurate representation of the radio communications between Denver Terminal Radar South and aircraft with which it was communicating.

5. That the Transcript of Susan M. Hytinen, dated January 6, 1978, is a substantially accurate representation of the radio communications between Denver Terminal Radar South position and various aircraft with which it was communicating between the hours of 1531:40 GMT and 1538:30 GMT on June 21, 1974 [1].

1. The transcript is as follows:

| | | |
|---|---|---|
| 1531:40 | 90X: | OK, how's that look. |
| 1531:45 | Radar: | Um, I'll get it here shortly I think, you have traffic at twelve o'clock, three miles southeast bound. |
| | 90X: | Roger, got him. |
| 1532:05 | Radar: | Seneca seven seven four roger, start the base in about four miles. |
| 1532:20 | Radar: | Nine zero xray, I don't know what's wrong with your transponder, but it shows, still showing zero six forty-six. |
| | 90X: | OK, I'll cycle it again and go back to zero six six seven. |
| | Radar: | That's correct sir. |
| 1532:35 | 31Q: | Denver Radar Cessna five one three one Quebec is with you. |
| | Radar: | Cessna three one Quebec roger, Denver altimeter is three zero zero three. |
| | 31Q: | Three one Quebec. |
| 1532:55 | Radar: | Nine zero xray turn northbound now for a right base entry, runway eight left |
| | 90X: | Roger, how's the transponder reading now, and are you reading me on the altimeter? |
| | Radar: | I have negative transponder reply at all now. |
| 1533:05 | 90X: | OK, thank you. |
| 1533:45 | 24R: | Denver Radar, Cessna three three two four Romeo. |
| 1533:50 | Radar: | Seneca seven seven four turn right heading zero one zero. |
| 1533:55 | 774: | Zero one zero. |
| 1534:00 | Unk: | Two west of Cherry is twin Cessna (unintelligible). |
| | 945: | Denver Radar Air Midwest nine forty-five is over Kiowa with Uniform. |
| 1534:05 | Radar: | Twin Cessna nine zero xray contact Denver Tower now one eighteen three. |
| 1534:10 | 24R: | (Unintelligible) Two four Romeo, over. |
| | Radar: | Roger, two four Romeo go ahead. |
| | 24R: | Two four Romeo is at seven thousand and request a three five ILS at Stapleton over. |
| 1534:15 | Radar: | Two four romeo turn left heading two niner zero maintain seven thousand, vectors ILS runway three-five approach. |
| 1534:20 | 24R: | Two four romeo. |
| 1534:25 | Radar: | Aircraft over Kiowa, say again the number |
| | 945: | Air Midwest nine forty-five eight thousand five hundred with Uniform. |
| 1534:30 | Radar: | Air Midwest nine forty-five Denver, squawk code zero six zero one. |

| | | |
|---|---|---|
| 1535:00 | Radar: | Air Midwest nine forty-five radar contact two west of Kiowa, traffic eleven o'clock and two miles, westbound. |
| | 945: | Negative contact, nine forty-five. |
| 1535:10 | 945: | OK, we got him now, nine forty-five. |
| 1535:15 | Radar: | Roger nine forty-five, descend and maintain eight thousand at your discretion and report level. |
| | 945: | OK, we'll call you at eight thousand, nine forty-five. |
| | Radar: | How's it look for a three-five ILS. |
| 1535:25 | Tower: | Five ILS, uh . I've got a United heavy to going and I won't have any departures after that. |
| | Tower: | It's OK for a three-five ILS (unintelligible). |
| | Radar: | We'll start him now. |
| 1535:35 | 66Q: | Denver Radar, twin Cessna six one six six Quebec. |
| | Radar: | Twin Cessna six six Quebec Denver, go ahead. |
| 1535:40 | 66Q: | Six Quebec, I'm thirty DME south, southeast for landing Denver. |
| 1535:50 | Radar: | Twin Cessna six six Quebec, Denver, squawk zero six zero three, what is your altitude. |
| 1535:55 | 66Q: | Six Quebec, eighty-five hundred feet, was that zero six zero three. |
| 1536:00 | Radar: | Zero six zero three for six six Quebec. |
| 1536:05 | 66Q: | Six Quebec. |
| | 774: | Seven seven four's on course. |
| 1536:10 | Radar: | Seven seven four I'm sorry about that, uh, cleared ILS back course runway eight right approach you're seven miles from Broadway Tower one eighteen three at Broadway. |
| 1536:20 | 774: | Seven seven four. |
| | Radar: | Cessna two four Romeo is two and a half miles south of Cherry, turn right heading three three zero, cleared ILS runway three-five approach, Tower one eighteen three at Cherry. |
| | 24R: | Two four Romeo. |
| 1536:30 | Radar: | November six six Quebec, radar contact twenty-three miles south of Stapleton and, uh, proceed up to the airport for a right base entry, runway eight left and descend and maintain eight thousand. |
| | 66Q: | Six Quebec. |
| 1536:40 | 945: | Air Midwest nine forty-five eight thousand. |
| 1536:45 | Radar: | Air Midwest nine forty-five thank you sir. |
| 1536:55 | 774: | (Unintelligible) Mayday, mayday, seven seven four just hit a bird. |

6. That the collision occurred just below the 8,000-foot shelf (approximately 7,900 MSL) and at a point just west (within one mile) of the nine-mile boundary of the Denver TC.

7. That plaintiff CFA is a Colorado corporation, is a citizen of the State of Colorado engaged in the business of flight instruction, and is located at Arapahoe County Airport.

8. That the Federal Aviation Administration (hereinafter referred to as FAA) is an instrumentality or agency of the United States government as defined by 28 U.S.C. § 2671.

9. That the plaintiff CFA conducts a flying school for pilot-trainees seeking instrument or multi-engine ratings in aircraft, from the Arapahoe County Airport.

10. That the Federal Aviation Act of 1958 authorizes the Federal Aviation Administrator to regulate the use of navigable airspace by assignments thereof (49 U.S.C. § 1348(a)); to prescribe air traffic rules (49 U.S.C. § 1348(c)); and to promulgate other substantive rules in addition to operating the air traffic control system.

11. That plaintiff CFA's employee and Chief Flight Instructor, Brian Gardner, held an FAA commercial certificate, with flight instructor, instrument, single and multi-engine land airplane ratings. He had accrued approximately 4,500 hours of flight time. His trainee, pilot James Allen, held an airplane transport pilot certificate for single engine land flight instructor, single and multi-engine land airplane ratings, instrument flight instructor, and a helicopter instructor rating. He had accrued approximately 2,500 hours of flight time.

12. That FAR 61.45 requires an applicant, for any flight test involving flight maneuvers solely by reference to instruments, to furnish equipment that excludes the visual reference of the applicant outside of the aircraft and that, inasmuch as trainee-pilot Allen on the instant flight was practicing for such a flight test, the wearing of a "hood" or view-limiting device by Allen at the time of the collision was in keeping with normal and accepted practice and procedure. Further, that when an aircraft is being flown in simulated instrument flight, FAR 91.21(b) requires that an appropriately-rated safety pilot have adequate vision forward and to each side of the aircraft or have a competent observer in the aircraft to supplement adequately the vision of the safety pilot.

13. That the other aircraft involved, a white, yellow and brown Beechcraft Bonanza, M–35, N–9727R, from Williams, Arizona, was flown by George Carter, accompanied by his wife, Elizabeth, and her parents, George and Hortense Hoffman. Mr. Carter held an FAA private certificate with airplane single engine land ratings and had accrued approximately 650 hours of flight time.

Note 1—Continued

| | | |
|---|---|---|
| 1537:00 | Radar: | Seven seven four, uh, what's wrong? |
| | 774: | Just hit a goose. |
| 1537:05 | 774: | The left wing is in bad shape, we just hit a bird, we're heading straight in and we got full power. . (unintelligible). |
| | Radar: | OK, seven four seven four maintain full power and uh continue straight in, standby this frequency. |
| 1537:15 | 774: | We're never gonna be able to make the runway. |
| 1537:20 | 774: | You got a helicopter possibly, we got a bad damage here. |
| | Radar: | You say you can't make the runway. |
| 1537:25 | 774: | We got a bad crushed in the left wing tip. |
| 1537:30 | 774: | You got a helicopter, we're going to try to make it on a road here. |
| 1537:35 | Radar: | OK, try to make it on the road, OK, we'll get a helicopter in that position right now. |
| 774: | | We're going to ditch in the lake, we're going to ditch in the lake, is everybody alright. |
| | Radar: | OK, understand, ditch in the lake, we'll get a helicopter right out there. |
| 1537:50 | 774: | We're squawking seven seven (unintelligible). |
| 1538:00 | Radar: | We'll get a helicopter right out seven seven four, just do the best you can, wind now at Stapleton one five zero degrees at seven |
| 1538:10 | 24R: | Denver Radar, Cessna three three two four Romeo is Cherry inbound. |
| | Radar: | Two four Romeo, Tower one eighteen three. |
| 1538:30 | 774: | OK, we've got a full right rudder and we're heading in toward the lake on final here. |

14. That the Bonanza N–9727R had departed Williams, Arizona, at approximately 06:20 MDT (12:20 GMT) on a VFR flight plan via Farmington, Alamosa, Walsenberg, Pueblo, direct to Boulder Municipal Airport, which is three miles north of the City of Boulder. That the last known contact of N–9727R with any FAA facility was at Farmington, New Mexico, and that there is no record of radio contact by N–9727R with FAA in Colorado or with Denver Approach Control or Denver Tower. Further, Carter's VFR flight plan indicated that his planned true airspeed was 160 knots, his planned cruising altitude was 8,500 feet MSL and the aircraft was not equipped with a transponder.

15. That the FAA designed the Instrument Approach Procedures for the 8 Right ILS approach to Stapleton International Airport and that said procedures were published and distributed under auspices of the U.S. Government.

16. That the deceased Bonanza pilot, George Carter, and his wife, Elizabeth, were survived by heirs, consisting of five dependent children, one of whom was a minor, all of whom were living in Williams, Arizona.

17. That the deceased aircraft passengers, George and Hortense Hoffman, were also survived by five adult children.

18. That the claim of the Carter heirs was settled with all the Carter heirs by Associated Aviation Underwriters/Federal Insurance Co. on behalf of Colorado Flying Academy for the total amount of $345,000. Further, that the claim of the Hoffman heirs was settled by Associated Aviation Underwriters/Federal Insurance Co. on behalf of Colorado Flying Academy for a total of $45,000. That the total settlement was $390,000.

19. That Seneca 774 was in radar and radio contact with Denver Approach Control of the FAA at the time of the collision; that Richard S. Igel was the FAA employee providing radar services to the aircraft; and that Richard S. Igel was operating within the scope and authority of his employment for FAA at the time of the accident.

20. That prior to each of the practice back course ILS approaches to Runway 8 Right, Seneca 774 requested the controller to position the aircraft on the final approach course west of the Edgewater Intersection.

21. That just prior to the collision, Seneca 774 had been cleared for an 8R ILS back course approach.

22. That the FAA conducted a radar flight check of Denver Terminal Radar as a result of this accident on June 25, 1974.

### FINDINGS OF FACT

Pursuant to Rule 16, F.R.Civ.P., a pre-trial order was entered which limited the issues for trial. In compliance with that order and in the same sequence, the court makes the following findings on the contested issues.

1. The increasing density of aircraft makes additional air traffic controls necessary to avoid mid-air collisions at certain U.S. high-density airports. By means of a Federal Aviation Regulation (FAR) set out in FAR Part 71, (14 Code of Federal Regulations § 71.401), the FAA established, as of March 28, 1974, a Denver Terminal Control Area (TCA) (Group II) around the primary airport of Denver, Stapleton International Airport, extending FAA Terminal Traffic Control for a radius of twenty miles from the center of the airport extending from the earth's surface approximately 5,280 feet above Mean Sea Level up to an altitude of 11,000 feet above MSL, 5,700 feet above the terrain, with variations in altitude, depending upon the direction from the center.

2. Denver Approach Control was vectoring and assigning altitudes to Seneca 774 which was under the Air Traffic Control of Denver Approach Control at the time of the collision.

3. The instrument approach procedure which authorized a descent below 8,000 feet, west of Edgewater, permitted the Seneca to drop below the 8,000-foot MSL protected shelf of the TCA and made it vulnerable to conflicting aircraft traffic passing underneath the TCA, which traffic was

"compressed" or "squeezed" *beneath* the 8,000-foot shelf and *above* the 6,900-foot minimum altitude for flight over the City of Denver.

4. The Bonanza aircraft approaching from the south was capable of being seen on the radar scope, even though the Bonanza was not equipped with a transponder and, for a very brief time, it may have been off the screen as a result of tangential loss.

5. Carter's Bonanza, 27R, came from the right hand side of the Seneca, toward the Seneca, at a horizontal angle of approximately 40° to 60° to the right, as measured from straight ahead.

6. The doorpost "blind spot" in the Seneca did not preclude from the Seneca instructor pilot from seeing the Bonanza.

7. The Denver terminal radar was operating properly immediately prior to and at the time of the mid-air collision.

8. The FAA was not negligent in maintaining the Denver terminal radar system.

9. The plaintiffs proved damages as set forth in the Introductory Statement of this memorandum.

10. The radar surveillance provided by the Defendant United States in the Denver TCA was adequate.

11. The Defendant United States was negligent in the following respects:

 a. In designing and establishing and maintaining the Denver TCA.

 b. In failing to provide a "buffer zone" horizontally and vertically in the Denver TCA to provide separation between controlled and uncontrolled traffic as they conflict near the boundary.

12. The defendant was negligent in establishing procedures that did not provide a minimum of 500 feet vertical separation for TCA traffic from non-TCA traffic.

13. The Seneca pilot-instructor, Brian Gardner, was negligent in failing to see and avoid the Bonanza.

14. The design negligence of the defendant was a proximate cause of the mid-air collision.

15. The design negligence of the defendant was not a primary cause of the mid-air collision.

16. The negligence of Brian Gardner was a primary cause of the mid-air collision as was the negligence of George Carter.

17. The plaintiffs are not entitled to indemnity for the settlement of the wrongful death claims of $1,300,000 in the amount of $390,000.

18. The plaintiffs' decision to make a settlement of the claims of the Carter and Hoffman heirs on behalf of CFA was a reasonable decision in view of the facts and circumstances surrounding the collision.

19. The total settlement payment to the heirs of the deceased Carters and Hoffmans was reasonable in light of the apparent total provable damages.

20. The amount paid in legal fees by the plaintiffs in negotiating the settlement with the Carter and Hoffman heirs was reasonable.

21. The trainee-pilot James Allen, in the Piper Seneca, was not negligent in the operation of the Piper Seneca.

22. The pilot of the Beechcraft Bonanza was negligent in failing to maintain a proper lookout for other aircraft, in failing to see and avoid the Piper Seneca, and in the operation of the Beechcraft Bonanza as pilot-in-command.

23. Once the radar approach controller issued the clearance for final approach to the Seneca, it had the right-of-way over all other aircraft, pursuant to FAR 91.67.

## CONCLUSIONS OF LAW

The substantive law of the State of Colorado governs this action. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Colorado law provides that the violation of a statute or ordinance by one whom the statute or ordinance was designed to protect constitutes negligence as a matter of law. If such negligence proximately causes an injury, the offender cannot recover damages. *Reed v. Barlow,* 153 Colo. 451, 386 P.2d 979, 981 (1963). Under visual flight conditions, regardless of

whether an aircraft is proceeding according to an ATC clearance or receiving radar services, the primary and ultimate responsibility for the avoidance of mid-air collisions rests with the pilots of aircraft. *Bibler v. Young*, 492 F.2d 1351 (6th Cir.), *cert. denied*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974). The plaintiffs make exceedingly forceful arguments that this burden is unreasonable and impossible to bear under the circumstances presented. I have given these arguments long, serious and frequent consideration. Inevitably, however, I return to the fundamental precept that I must apply the law as I see it and not as I wish it to be.

The negligence of the pilots of Colorado Flying Academy's Seneca 774 is imputable to CFA and its insurers, plaintiffs Federal Insurance Company and Associated Aviation Underwriters. The negligence of George Carter, pilot of the Bonanza is imputable to his heirs who seek to recover for his wrongful death, and likewise that negligence is imputable to an assignee who pursues the heirs' cause of action. The negligence on the part of pilot Carter is imputable by operation of law to plaintiffs CFA, Federal Insurance Company, and AAU.

 Pilots Brian Gardner and George Carter each failed to maintain the level of vigilance required of pilots by the Federal Aviation Regulations and by good operating practice. When pilots operate within an airport traffic area, the duty to keep a proper lookout is sharpened because the sky is more congested. *Thibodeaux v. United States*, 14 Avi.Cas. 17,653 (E.D.Tex.1976), at 17,659. The language of the Federal Aviation Regulations requires the pilot to operate on the assumption that there is other traffic. *United States v. Miller*, 303 F.2d 703 (9th Cir. 1962), *cert. denied*, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963). The pilot has a continuing duty to be aware of danger with his own eyes and instruments. *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir. 1972).

 The violations of the Federal Aviation Regulations and good operating practice by the pilots were the proximate causes of the collisions herein. Pilot Carter's oper-

ation of his Bonanza without regard for the airspace restrictions surrounding the Air Force Academy is indicative of further negligence when flying nearer the Denver TCA.

 Air controllers are required to abide by the provisions of their manuals and must warn of dangers reasonably apparent to them. The guidelines issued by the FAA to its regions prior to the accident concerning containment of terminal instrument procedures create no duty on the government toward the owners and occupants of small general aviation aircraft, since it is an internal memo and generates no justifiable reliance on the part of pilots. *Zabala Clemente v. United States*, 567 F.2d 1140 (1st Cir.), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). An air traffic controller has the right to rely upon the assumption that a pilot knows and will abide by all applicable Federal Aviation Regulations. *Baker v. United States*, 417 F.Supp. 471, 486 (W.D.Wash.1975). Likewise, he is not required to foresee or anticipate the unlawful, negligent or grossly negligent acts of pilots. *Id.*

 The foregoing conclusions of law do not resolve all of the issues between the parties. Given the findings of negligence in design, I must consider additional questions of law concerning the discretionary function. It is axiomatic that the United States is immune from suit save as Congress specifically consents to waive that immunity. *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). When sovereign immunity is waived, Congress is permitted to specify the terms and conditions under which suits may be brought. *Honda v. Clark*, 386 U.S. 484, 87 S.Ct. 1188, 18 L.Ed.2d 244 (1967). The Federal Tort Claims Act is a limited waiver of that immunity, and the United States may be found liable only in the manner and to the degree to which it has consented. *Wright v. United States*, 568 F.2d 153, 158 (10th Cir. 1977), *cert. denied*, 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978). Certain categories of torts are excluded from the Federal Tort Claims Act's coverage by 28

U.S.C. § 2680. A court lacks jurisdiction to entertain a claim so excluded. *First National Bank v. United States*, 552 F.2d 370, 374 (10th Cir.), *cert. denied*, 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977).

The provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, and 28 U.S.C. § 1346(b) do not apply to:

(a) Any claim based upon the act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

[T]he "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes *more* than the initiation of programs and activities. *It also includes determinations made by executives or administrators in establishing plans, specifications or schedules or operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.*

*Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–68, 97 L.Ed. 1427 (1953); *First National Bank in Albuquerque v. United States*, 552 F.2d 370 (10th Cir.), *cert. denied*, 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977).

The United States may not be subjected to liability arising from the absence of stricter air safety regulations. *Marr v. United States*, 307 F.Supp. 930, 931 (E.D. Okla.1969). The Federal Aviation Act of 1958 authorizes the Federal Aviation Administrator to regulate the use of navigable airspace by assignments thereof, to prescribe air traffic rules, and to promulgate other substantive rules in addition to operating the air traffic control system. The process employed by the FAA to propose, design, and develop the various TCA's throughout the country was the administrative rule making process.

■ Whether the discretionary function exception applies, turns to some extent on: whether agency policy, as expressed in rules and regulations adopted by higher-ranking officials, is for lower-level personnel to make policy decisions on a case-by-case basis, guided only by general statements of agency philosophy, or whether such lower officials are required by rules and regulations to undertake limited specific functions upon being presented with a situation requiring some official action on their part.

*In Re Air Crash Disaster Near Silver Plume, Colo.*, 445 F.Supp. 384, 402 (D.Kan. 1977). The functions performed by airspace specialists, like Mr. Wilson, in planning and designing the TCA configuration for a specific location involve judgment, planning and policy-making discretionary activities. They are therefore protected from tort claims. The policy decision as to which instrument approach procedure should or should not be contained within the TCA is a decision which is incident, or directly related to, the attainment of the objectives sought by the creation of the TCA. The decision by the FAA not to provide for "buffer" zones or VFR corridors in TCA design is a policy judgment of the agency falling within the protection of the discretionary function exception.

A few issues remain, but the findings of fact and conclusions of law I have made concerning the negligence of plaintiffs and the discretionary function exception to the Tort Claims Act make detailed discussion unnecessary. The certification of the design of aircraft as airworthy is likewise a discretionary function. Even so, plaintiffs have not established by a preponderance of the evidence that the certification of the Piper Seneca was negligent, erroneous or, for that matter, even incorrect.

■ A detailed analysis of the law of indemnity is not necessary, but I do note that indemnity is not precluded by voluntary settlement without giving notice to the indemnitor where the settling indemnitee

can show that the indemnitor was in fact liable to the person receiving the settlement. Here, the defendant was not liable for the Carter-Hoffman claims. Hence, indemnity does not apply. Likewise, it is unnecessary to consider fully the defendant's contention that recovery of the claims added at trial were barred. I think defendant is clearly wrong since these were claims made by the plaintiff insurance companies who were brought into the case at the defendant's insistence after the original claims had been filed by the original plaintiff, Colorado Flying Academy. Thus, were I to find defendant liable I would permit recovery of the amounts proven at trial.

IT IS ORDERED that judgment is hereby awarded to the defendant and against the plaintiffs. Each party shall bear its own costs herein expended.