COLORADO FLYING ACADEMY, INC., a Colorado corporation, Federal Insurance Company, and Associated Aviation Underwriters, Plaintiff-Appellants,

v.

The UNITED STATES of America, Defendant-Appellee.

No. 81–1485.

United States Court of Appeals, Tenth Circuit.

Jan. 4, 1984.

L.B. Ullstrom, Denver, Colo. (Edward J. Rau, Denver, Colo., was also on the brief), for plaintiffs-appellants.

Gary W. Allen, Asst. Director, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C. (Stuart E. Schiffer, Acting Asst. Atty. Gen., and Joseph F. Dolan, U.S. Atty., Denver, Colo., were also on the brief), for defendant-appellee.

Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.

HOLLOWAY, Circuit Judge.

This timely appeal is from a judgment entered for defendant United States of America in an action for damages and indemnification brought under the Federal Tort Claims Act. *Colorado Flying Academy, Inc. v. United States of America,* 506 F.Supp. 1221 (D.Colo.1981) (*C.F.A.*). The case arose out of a mid-air collision of two aircraft near Stapleton Airport, Denver, Colorado.

I

*The factual background*

A.

At about 9:30 a.m. on June 21, 1974—a clear day with visibility of 60 miles—a Pip-

er Seneca aircraft (Seneca) owned by plaintiff Colorado Flying Academy (Academy), collided with a Beechcraft Bonanza (Bonanza) occupied by four persons. The trainee and instructor inside the Seneca ditched in a nearby lake and received only minor injuries. The Bonanza crash-landed in the Crown Hill Cemetery and the four adult occupants died.

The Academy operates a flying school and used the Seneca in teaching instrument flight procedures. On the morning of the collision, trainee James Allen was seeking advanced instrument training.[1] He sat in the left seat and wore a hood, designed to limit his vision to the aircraft's instrument panel. The instructor, Brian Gardner,[2] sat in the right hand seat. Mr. Allen was practicing Instrument Landing System (ILS)[3] approaches on runway 8R.[4] This particular approach is a published Instrument Approach Procedure, designed by the Federal Aviation Administration (FAA), known as the 8R ILS Back Course Approach. *Id.* at 1226. The Seneca had requested the air controller, Richard Igel, to position the aircraft on the final approach course, and just prior to the collision the Seneca had been cleared for an 8R ILS back course approach. *Id.* The instructor, Mr. Gardner, was the pilot in command. *Id.* at 1223.

The Bonanza was flown by its owner, George Carter.[5] His wife and her parents, the Hoffmans, were passengers. The Carters and Hoffmans were flying from Williams, Arizona, to Boulder, Colorado, under visual flight rules (VFR).[6] Their altitude was approximately 7,900 feet above mean sea level (MSL).[7] They were not receiving any assistance from air traffic controllers,[8] and their plane was not equipped with a transponder. The Bonanza could be seen by radar, although "for a very brief time, it may have been off the screen as a result of tangential loss." *C.F.A.*, 506 F.Supp. at 1227.

The Federal Aviation Act of 1958, 49 U.S.C. § 1348, empowers the FAA to regulate navigable airspace. In carrying out this responsibility, the FAA created terminal control areas (TCAs) in various locations throughout the country. The TCA surrounding Denver's primary airport, Stapleton International Airport, was established as of March 28, 1974 by a Federal Aviation Regulation (FAR). *C.F.A. supra,* 506 F.Supp. at 1226. The TCA is intended to reduce the danger of midair collisions, in part by separating controlled and uncontrolled air traffic. With minor exceptions,

1. The district court found that Mr. Allen "held an airplane transport pilot certificate for single engine land flight instructor, single and multi-engine land airplane ratings, instrument flight instructor, and a helicopter instructor rating. He had accrued approximately 2,500 hours of flight time." *C.F.A.*, 506 F.Supp. at 1225.

2. Mr. Gardner, CFA's Chief Flight Instructor, held an "FAA commercial certificate, with flight instructor, instrument, single and multi-engine land airplane ratings. He had accrued approximately 4,500 hours of flight time." *C.F.A.*, 506 F.Supp. at 1225.

3. The ILS is a navigation aid which provides the pilot with course and elevation information in relation to the runway by a cockpit instrument displaying a vertical needle showing deviation from course and a horizontal needle showing deviation from the planned glide path, or elevation.

4. Runway 8R refers to runway eight right which has a magnetic course of 080 degrees east from magnetic north.

5. "Mr. Carter held an FAA private certificate with airplane single engine land ratings and had accrued approximately 650 hours of flight time." *C.F.A.*, 506 F.Supp. at 1225.

6. The Bonanza was uncontrolled traffic in that it was operating VFR, was outside the terminal control area of Stapleton Airport, and was not in radio contact with, or controlled by, air traffic facilities. VFR pilots are essentially operating independently, absent communication with traffic control. Thus, their intentions are not known.

7. 7,900 feet above MSL would be approximately 2,620 feet above the ground in the Denver area.

8. Pursuant to stipulations of facts, the district court noted that the Bonanza's last known contact with any FAA facility was in New Mexico and that "there is no record of radio contact by [the Bonanza] with FAA in Colorado or with Denver Approach Control or Denver Tower." *C.F.A.*, 506 F.Supp. at 1226.

only controlled air traffic is allowed within a TCA. According to an FAA information release of March 26, 1968 (Plaintiffs' Exhibit 39), the TCA program would "minimize pilot reliance on the 'see and avoid' concept of separation and ... eliminate the unknowns ... so that aircraft landing at the major hub airports not only are segregated from all other aircraft but also are provided with separation by the air traffic control system." Id. at 2.

Although general guidelines regarding TCA design were given by the FAA from Washington, D.C., the task of tailoring the Denver TCA configuration fell to Gerald Wilson, an FAA Airspace Specialist for the Rocky Mountain Region. After proposals, public comment and revisions, the TCA design in effect at the time of this accident was determined. Generally, the Denver TCA can be visualized as a group of three cylinders, each having its center at Stapleton airport. At the time of the collision, the first cylinder reached from the ground to 8,000 feet MSL and extended radially from Stapleton for a distance of nine miles. The second cylinder was from 8,000 feet to 10,000 feet MSL with a radial distance of fifteen miles. The third cylinder reached from 10,000 feet to 11,000 feet MSL and extended radially for twenty miles. The interiors of these cylinders form the TCA. See Appendix.

Just prior to the collision, the Seneca was cleared for final approach on the 8R ILS Back Course Approach. The glide slope for this approach caused the Seneca to descend below the floor of the TCA's second cylinder (8,000 MSL) briefly before re-entering the TCA boundary at a distance of nine miles from Stapleton Airport. See Appendix. Meanwhile the Bonanza was passing through Denver without entering the TCA. It was flying just under the floor of the second cylinder (about 7,900 feet MSL) and outside the nine mile radius of the TCA's first cylinder. As the district court noted, traffic avoiding the TCA is compressed by the 8,000 foot MSL shelf of the TCA and the 6,900 foot MSL minimum altitude for flight over Denver. During the brief period as the Seneca dropped out of the TCA on the 8R ILS Back Course Approach, the Bonanza flew toward the Seneca's starboard side. The Bonanza struck the Seneca "at a horizontal angle of approximately 40° to 60° to the right, as measured from straight ahead." Id. at 1227. Mr. Allen and Mr. Gardner, who thought they had struck a bird, see id. at 1224–25 n. 1, received only minor injuries in ditching the Seneca in a nearby lake. All occupants of the Bonanza died in a crash-landing.

## B.

■ Plaintiff Academy and the insurance company plaintiffs brought this action under the Federal Tort Claims Act. 28 U.S.C. §§ 1346(b), 2671 et seq. They seek $471,000, representing $81,000 for the loss of the Seneca and $390,000 in settlement payments made to heirs of the occupants of the Bonanza, the Carters and the Hoffmans.[9]

---

9. Plaintiffs also sought damages for money paid to Crown Hill Cemetery, for aircraft salvage, for the Bonanza's destruction and certain other miscellaneous costs. Plaintiffs did not make administrative claims for these damages. Under Section 2675(a), 28 U.S.C., denial of an administrative claim is a jurisdictional prerequisite before a claimant can bring suit in district court. Lurch v. United States, 719 F.2d 333, 335 n. 3 (10th Cir.1983); Three-M Enterprises v. United States, 548 F.2d 293 (10th Cir.1977). Therefore, an action for these damages cannot be maintained.

The complaint alleged that the United States, through the FAA, was negligent by: (1) establishing the Denver TCA without fully containing the 8R ILS Back Course Approach within the TCA's boundaries; (2) failing to provide a "buffer zone" surrounding the TCA to enhance separation between controlled and uncontrolled traffic; (3) failing to establish a corridor over the Denver TCA to avoid compression of traffic around its edges; (4) having insufficient numbers of controllers on duty; (5) failing to maintain properly the radar equipment; (6) failing to observe the Bonanza visually and warn the Seneca, and; (7) placing the Seneca "where it was at hazard with conflicting traffic." I R. 8–9.

Plaintiffs also contended that the radar controller was negligent by: (a) failing to devote full attention to the radar scope; (b) failing to monitor the Bonanza; (c) maladjusting the radar equipment resulting in improper range and intensity of the scope; (d) vectoring the Seneca outside the TCA, and; (e) failing to warn the

The United States defended primarily on the grounds of the discretionary function and misrepresentation exceptions to the Federal Tort Claims Act, 28 U.S.C. §§ 2680(a) and (h). The Government also argued that the pilots' negligence barred recovery. I R. 22–29.

The district court denied any relief to plaintiffs concluding, primarily, that negligence on the part of pilots Carter and Gardner as well as the discretionary function exception of 28 U.S.C. § 2680(a) required judgment for the Government. The court found that there was Government negligence in designing, establishing and maintaining the Denver TCA and failing to provide a horizontal and vertical buffer zone for the TCA. *C.F.A.*, 506 F.Supp. at 1227. Such design negligence was "a proximate cause" although not "a primary cause" of the mid-air collision. *Id.* This negligence was not actionable, however, because it came within the discretionary function exception. *Id.* at 1229. The policy decision as to which instrument approach procedure should or should not be contained within the TCA is a decision which is incident, or directly related to, the attainment of the objections sought by the creation of the TCA. *Id.*

Whether the trial court made findings regarding the negligence of the air traffic controller is disputed by plaintiffs on appeal. As we will explain, we believe that the trial court held that there was no air traffic controller negligence, and made sufficient findings on this issue which are not clearly erroneous. Furthermore, we conclude that the trial court correctly applied the discretionary function exception. Accordingly, we affirm.

## II

### *The design of the Denver Traffic Control Area*

■ We consider the discretionary function exception first because overcoming this hurdle is "a jurisdictional prerequisite to suit." *Baird v. United States,* 653 F.2d 437, 440 (10th Cir.1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982). This exception insulates the United States from liability for the performance, or failure to perform, a discretionary function even if the discretion is abused. 28 U.S.C. § 2680(a).

Plaintiffs contend that the Government's negligence in designing, establishing, and maintaining the Denver TCA is not within the scope of the discretionary function exception because the 8R ILS Back Course Approach was not fully contained inside the TCA in contravention of specific guidelines set forth in FAA directives. Brief of Appellants at 7. This, plaintiffs argue, created a mandatory duty to contain the instrument approach within the TCA, and the negligent failure to carry out that duty is not within the exception. *See Jackson v. Kelly,* 557 F.2d 735, 737–38 (10th Cir.1977) (en banc). If such mandatory guidelines existed and they were violated, then the discretionary function exception would not bar recovery. *See Barton v. United States,* 609 F.2d 977, 979 (10th Cir.1979); *First National Bank in Albuquerque v. United States,* 552 F.2d 370, 375–76 (10th Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977); *Griffin v. United States,* 500 F.2d 1059, 1066–69 (3rd Cir.1974). Thus, our inquiry must begin with the various regulations and directives to determine if they created a mandatory duty to design a TCA in a particular manner.

There is substantial evidence demonstrating that no such mandatory duty existed. Plaintiffs' own evidence supports this conclusion. For example, plaintiffs refer to a communication from the FAA to subordinate Air Traffic Division Chiefs which states in part:

All Group II TCAs should be implemented in accordance with the following guidelines:

---

Seneca. *Id.* at 10. Plaintiffs prayed for a determination of the degree or percentage of negligence of each of the parties involved, including the FAA, under the Colorado comparative negligence statute. *See* Colo.Rev.Stat. § 13–21–111 (1973).

Simplification of the TCA airspace configuration is a prime prerequisite. Vertical and lateral limits should be standardized where possible and the number of subareas kept to a minimum.

TCA airspace should initially consist of three concentric circles centered on the primary airport, preferably at the VORTAC site if located on the primary airport. The radius of the outer circle should *normally be 20 miles with sufficient airspace to contain existing terminal IFR procedures.*

*This recommended airspace configuration should be developed for TCA candidate locations prior to considering potential alteration resulting from user participation. However, analysis of the terminal area operations may necessitate tailoring the airspace in a different manner depending upon the operational needs at the primary airport and the underlying satellite airports.* Wherever possible, VOR radials and DME arcs shall be used to define the boundaries of a TCA and its subareas. It is important, however, that prominent visual landmarks also be considered as aids to the VFR traffic desiring to remain clear of the area.

Plaintiffs' Exhibit 25 at 1 (emphasis added).

Use of the word "normally" in the emphasized portion of the communication indicates that there was some latitude in the

design of the TCAs. *See* XIV R. 148. The communication as a whole contemplates that the TCAs can be tailored, depending on the needs of a particular location. The emphasized language illustrates the discretionary quality of TCA design. Hence we feel that this FAA communication did not create a fixed or readily ascertainable standard from which a deviation would be actionable. Rather, by its own terms, it called for interest-balancing and tailoring to meet local conditions. *See Miller v. United States,* 710 F.2d 656, 662–66 (10th Cir.1983) (petition for cert. filed).[10]

Furthermore, the record reveals that the design of the Denver TCA was determined after analysis of competing aviation needs. Those who sought to maximize safety wanted a larger TCA, and those who objected to the inconvenience the TCA would cause wanted either a smaller TCA or none at all. *See* Public Hearing on Notice of Proposed Rule Making 69–41 (January 7, 1970) at 3–6, 54–55, Defendant's Exhibit 16. The impact on all users had to be balanced in designing and maintaining the Denver TCA. *See id.,* XIV R. 135 (testimony of Gerald Wilson, Denver TCA designer).[11]

We are convinced that these administrative decisions fall within the discretionary function exception. Competing interests were weighed and then policy decisions were made which the exception was intended to cover. *Miller v. United States Department of Transportation, supra,* 710 F.2d

**10.** Plaintiffs also refer to a memorandum dated February 8, 1973, from the Acting Chief of the Denver Tower describing the proposed Denver TCA. This memorandum states in part: "Proposed floors of the TCA provide for containment of IFR arrivals in TCA airspace to touchdown in all approach configurations." Plaintiffs' Exhibit 26 at 1. We note that this memorandum was issued more than 16 months before actual implementation of the TCA. Actual implementation required public comment and an evaluation of general aviation interests, commercial air carrier interests, the traffic needs of small aircraft as well as large turbine-powered aircraft, and consideration of the demands of aviation lobbying organizations. *See, e.g.,* XIV Tr. 149, 169, 172.

**11.** The following findings of the trial court indicate the policy-making involved:

The functions performed by airspace specialists, like Mr. Wilson, in planning and designing the TCA configuration for a specific location involve judgment, planning and policy-making discretionary activities. They are therefore protected from tort claims. The policy decision as to which instrument approach procedure should or should not be contained within the TCA is a decision which is incident, or directly related to, the attainment of the objectives sought by the creation of the TCA. The decision by the FAA not to provide for "buffer" zones or VFR corridors in TCA design is a policy judgment of the agency falling within the protection of the discretionary function exception. *C.F.A.,* 506 F.Supp. at 1229.

at 665–66; *First National Bank in Albuquerque v. United States, supra,* 552 F.2d at 375–76. Therefore we find no error in the ruling of the district court that the claim of Government negligence in designing the Denver TCA must be rejected because the Government decisions in question are within the discretionary function exception of § 2680(a).

## III

### *The conduct of the air traffic controller*

We now turn to plaintiffs' argument that the trial court failed to make findings regarding the negligence of the air traffic controller. Plaintiffs reason that the trial court indicated it would make findings in the same sequence as the issues were entered in the pretrial order. *C.F.A. supra,* 506 F.Supp. at 1226. In the pretrial order, the eleventh contested issue of fact and law contained a number of issues including whether there was air controller negligence. I R. 41.[12] There were not, however, specific findings discussing the particulars of the

claim of negligence by the air traffic controller, although there were some findings about the radar surveillance.[13] Because of the lack of detailed findings on their specifications of negligence by the air traffic controller, the plaintiffs argue that the court failed to make findings as required under Rule 52(a), Fed.R.Civ.P. 52(a).

■ Rule 52(a) provides that in actions tried without a jury "the court shall find the facts specially and state separately its conclusions of law thereon . . . ." *Id.* The Rule is designed to provide the appellate court with a clear understanding of the basis of the trial court's decision and to aid the trial court in considering and adjudicating the facts. *Ramey Construction Co. v. Apache Tribe,* 616 F.2d 464, 466–67 (10th Cir.1980); *Featherstone v. Barash,* 345 F.2d 246, 249 (10th Cir.1965); 9 C. Wright & A. Miller, *Federal Practice And Procedure* § 2571 at 679–80 (1971).[14]

■ To meet the burden that Rule 52(a) imposes, there must be findings either in

---

**12.** The portion of the pretrial order at issue provided:

11. Was the Defendant United States negligent in any of the following respects:

\* \* \* \* \* \*

d. In that the FAA failed to properly maintain and operate the radar equipment utilized?

e. Was the radar approach controller negligent in failing to provide adequate separation between the aircraft?

f. Was the radar approach controller negligent for failing to direct the Seneca out of danger?

g. Was the radar approach controller negligent for failing to perceive a radar target for the Bonanza and to warn the Seneca of the conflicting traffic of the Bonanza?

h. Was the radar approach controller negligent in vectoring the Seneca at an altitude unprotected by the Denver TCA?

i. Was the radar approach controller negligent in placing the Seneca at an altitude which did not provide five hundred (500) feet vertical separation from conflicting uncontrolled traffic permitted to travel outside the Denver TCA?

j. In permitting the certification of the Seneca with such a large door post "blind spot?"

I R. 41.

**13.** The district court did make the following findings on the radar surveillance along with its

findings on Government negligence with respect to the TCA:

7. The Denver terminal radar was operating properly immediately prior to and at the time of the mid-air collision.

8. The FAA was not negligent in maintaining the Denver terminal radar system.

\* \* \* \* \* \*

10. The radar surveillance provided by the Defendant United States in the Denver TCA was adequate.

11. The Defendant United States was negligent in the following respects:

a. In designing and establishing and maintaining the Denver TCA.

b. In failing to provide a "buffer zone" horizontally and vertically in the Denver TCA to provide separation between controlled and uncontrolled traffic as they conflict near the boundary.

12. The defendant was negligent in establishing procedures that did not provide a minimum of 500 feet vertical separation for TCA traffic from non-TCA traffic.

*C.F.A.,* 506 F.Supp. at 1227.

**14.** Both *Featherstone* and Wright & Miller point out that an additional purpose behind Rule 52(a) is to make definite what has been decided so the doctrines of collateral estoppel and *res judicata* can be applied.

the opinion or stated elsewhere that are sufficient to indicate the factual basis for the ultimate conclusion. *See Kelley v. Everglades Drainage District,* 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 1485 (1943); *Snyder v. United States,* 674 F.2d 1359, 1363 (10th Cir.1982). This does not require inordinately detailed findings. *See Nulf v. International Paper Co.,* 656 F.2d 553, 561 (10th Cir.1981). *Featherstone v. Barash,* 345 F.2d 246, 250 (10th Cir.1965), *Woods Construction Co. v. Pool Construction Co.,* 314 F.2d 405, 406 (10th Cir.1963). The Supreme Court articulated the general standard for the findings in *Kelley v. Everglades Drainage District, supra,* 319 U.S. at 415, 63 S.Ct. at 1141:

> It may be that adequate evidence as to these matters is in the present record. On that we do not pass, for it is not the function of this Court to search the record and analyze the evidence in order to supply findings which the trial court failed to make. Nor do we intimate that findings must be made on all of the enumerated matters or need be made on no others; *the nature of the evidentiary findings sufficient and appropriate to support the court's decision as to fairness or unfairness is for the trial court to determine in the first instance in the light of the circumstances of the particular case. We hold only that there must be findings, stated either in the court's opinion or separately, which are suffi-*

*cient to indicate the factual basis for the ultimate conclusion.*

*Id.* at 421–22, 63 S.Ct. at 1145. (emphasis added).

■ We believe that the findings were sufficient to discern the basis for the trial court's decision on the claim of negligence by the air traffic controller. In the section of the opinion entitled "Conclusions of Law" the court stated that "an air traffic controller has the right to rely upon the assumption that a pilot knows and will abide by the applicable Federal Aviation Regulations." *C.F.A.,* 506 F.Supp. at 1228. This must be considered with the conclusion that the Seneca and Bonanza pilots "each failed to maintain the level of vigilance required of pilots by the Federal Aviation regulations and by good operating practice." *C.F.A.,* 506 F.Supp. at 1228.[15] The judge's reasoning is apparent that the controller was therefore not at fault. Moreover the trial judge's opinion stated the general nature of the claims of the parties and these included allegations of failure to maintain the radio equipment properly, FAA failure to direct the plaintiffs' aircraft out of danger, and failure to advise plaintiffs that another aircraft was in dangerous proximity. *Id.* at 1223. Then the trial judge's findings tracked the outline of the pretrial order where questions of negligence were set out in paragraph 11, I R. 41, and the judge made the findings of the detailed negligence which he did find, as quoted in

---

**15.** As the parties' briefs make clear, there are three FAR's of importance to the issues on appeal. The "see and avoid" concept is set forth at FAR 91.67(a), 14 C.F.R. § 91.67(a) (1975):

> When weather conditions permit, regardless of whether an operation is conducted under Instrument Flight Rules or Visual Flight Rules, vigilance shall be maintained by each person operating an aircraft so as to *see and avoid* other aircraft in compliance with this section. When a rule of this section gives another aircraft the right of way, he shall give way to that aircraft and may not pass over, under, or ahead of it, unless well clear.

General provisions of pilot authority are found at FAR 91.3(a)(b), 14 C.F.R. §§ 91.-3(a)(b) (1975):

> The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.
>
> In an emergency requiring immediate action, the pilot in command may deviate from any rule of this subpart or of Subpart B to the extent required to meet that emergency.

Finally, the right-of-way rules pertinent to aircraft on landing approaches are set forth in FAR 91.67(f), 14 C.F.R. § 91.67(f) (1975):

> Aircraft, while on final approach to land, or while landing, have the right of way over other aircraft in flight or operating on the surface. When two or more aircraft are approaching an airport for the purpose of landing, the aircraft at the lower altitude has the right of way, but it shall not take advantage of this rule to cut in front of another which is on final approach to land, or to overtake that aircraft.

note 15, *supra.* It is clear, we feel, that the findings thus rejected the other claims of negligence alleged.

■ We are satisfied that the findings of fact were sufficient on the claims of negligence by the air traffic controller. They rejected the claims of negligence by the controller and the findings are amply supported by the record. There is conflicting evidence between the testimony of plaintiffs' expert McDermott, X R. 32 *et seq.,* and the testimony of the air traffic controller, Mr. Igel, XIV R. 44–125, explaining and defending his actions, and the testimony of the Government expert Rowan who testified that the performance of the air traffic controller in no way contributed to the accident. XV R. 216 *et seq.* We feel that the findings are not clearly erroneous.

We have considered *Deweese v. United States,* 576 F.2d 802 (10th Cir.1978), and *Yates v. United States,* 497 F.2d 878 (10th Cir.1974), relied on by plaintiffs, and these opinions did uphold awards against the Government based on air traffic controller negligence. We feel these cases are specific fact situations which are distinguishable and that the principles applied in them are not inconsistent with our conclusions here.

In sum, we conclude that there was no error here in the findings against the plaintiffs on the claim of negligence by the air traffic controller.

## IV

### The claims for indemnity and for direct recovery for negligence against the United States

The plaintiffs argue that the trial court seriously erred in finding that recovery was barred by reason of the contributory negligence of the pilots, Gardner and Carter; that the plaintiffs are not seeking recovery under any assignments of claims from the Carter and Hoffman heirs, which might cause the pilots' negligence to be charged to plaintiffs; and that their claims for recovery on principles of indemnity should prevail due to the primary negligence by the Government through the acts of the air traffic controller and the FAA design of the Denver TCA contrary to specific guidelines.

Before analyzing these additional claims of error it is important to make clear that recovery is sought by plaintiffs for two distinct types of damages. First, plaintiffs seek compensation for the loss of the Academy's Seneca airplane. Second, they seek to recover sums reasonably paid in settlements with the heirs of the occupants of the Bonanza. Theoretically, plaintiffs could recover directly from the United States on a negligence claim for the loss of the Seneca. The other damages are different and plaintiffs seek to recover the amounts paid as reasonable settlements with the Carter and Hoffman heirs under indemnity principles on the theory that the Government is primarily liable due to its primary negligence.

### A. *Contributory negligence*

■ In effect, plaintiffs argue that the trial court erroneously barred recovery because of plaintiffs' contributory negligence. Plaintiffs reason that the trial court relied on a decision that pre-dated Colorado's adoption of a comparative negligence statute,[16] and that this statute applies to the instant action. We agree that the Colorado

---

**16.** The district court stated that under Colorado law, a violation of a statute or ordinance is negligence as a matter of law, and that if such negligence proximately causes the injury, the offender cannot recover. We recognize, as plaintiffs point out, that in reaching this conclusion the district court cited *Reed v. Barlow,* 153 Colo. 451, 386 P.2d 979, 981 (1963) which antedated Colorado's adoption of a comparative negligence rule. Although we are puzzled by this, we need not decide whether the court failed to make the proper comparative negligence analysis under Colorado law.

In passing, we note that it might be possible to construe the district court's opinion so that it is consistent with Colorado's comparative negligence statute. Colorado's comparative negligence statute permits recovery only if the plaintiff's negligence "was not as great as the negligence of the person against whom recovery is sought." Colo.Rev.Stat. § 13–21–111 (1973). As explained in Part III, we view the district court's opinion as finding no negligence by the air traffic controller. The court found that the design negligence of the United States was "a proximate cause" of the collision,

comparative negligence statute applies, but we need not decide whether the trial court's decision is consistent with the statute.

We reach this conclusion because we can affirm on any grounds that find support in the record. *E.g., Mountain States Natural Gas Corp. v. Petroleum Corp. of Texas,* 693 F.2d 1015, 1020 (10th Cir.1982); *Cayce v. Carter Oil Co.,* 618 F.2d 669, 677 (10th Cir. 1980); *Keyes v. School District No. 1, Denver, Colorado,* 521 F.2d 465, 472–73 (10th Cir.1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976). As we have already discussed, we agree with the trial judge that any negligence in designing, establishing and maintaining the Denver TCA is within the discretionary function exception and that the trial court made adequate findings, which we sustain, that there was no air traffic controller negligence. Thus, regardless of whether the court misapplied Colorado's comparative negligence rules, there is no actionable Government negligence [17] and plaintiffs cannot recover.[18] Hence any error in the findings on the basis of a bar due to contributory negligence is of no consequence.

### B. *Indemnity*

As we have already explained, we conclude that we should uphold the trial court's rulings that there was no actionable Government negligence. Thus again, we should affirm the judgment even if there were an infirmity in the trial court's reasoning on the indemnity issue. Nevertheless, we have considered the trial court's ruling that the plaintiffs do not have a right to indemnity under Colorado law and find no error in that conclusion.[19]

Although plaintiffs argue that they should be indemnified because the Government is primarily liable, their position is not well taken. The trial judge's analysis and conclusions dispose of this claim. He found that the negligence in design of the TCA was "not a primary cause" of the collision, although the design negligence was found to be "a proximate cause" of the collision. *C.F.A.,* 506 F.Supp. at 1227. Moreover, we feel that the trial judge's opinion adequately found that there was no air traffic controller negligence. On the other hand the negligence of Gardner, the Academy's flight instructor, was found to be "a primary cause" of the mid-air collision, as was the negligence of Carter. *Id.* Under Colorado law a tortfeasor is entitled to indemnity only where he is secondarily liable and he seeks recovery from one who is primarily

---

though not "a primary one." *C.F.A., supra,* 506 F.Supp. at 1227. Further the court found that the negligence of Gardner and of Carter was "a primary cause" of the mid-air collision. *Id.* This could be read to mean that the negligence of plaintiffs is greater than any negligence on the part of the defendant, barring recovery under the Colorado statute. *See Graf v. Tracy,* 194 Colo. 1, 568 P.2d 467 (1977).

The district judge did not express the degree of each person's negligence as a percentage. The pretrial order states that one contested issue of fact and law was whether the Seneca pilots were negligent, and if so, the percentage of their negligence compared to that of the Government. I R. 42. Moreover, Colorado's comparative negligence statute also specifies that the court determine the degree of negligence expressed as a percentage. Colo.Rev. Stat. § 13–21–111(2)(b) (1973). We need not decide whether there was any error on this score. As explained in the text, we can affirm on a ground not involving any comparison of the negligence of different persons.

**17.** We also note the district court found that the Denver Terminal radar was operating prop-

erly before and at the time of the collision, and that the FAA was not negligent in maintaining this radar. *C.F.A., supra,* 506 F.Supp. at 1227.

**18.** Plaintiffs also complain that the negligence of the Bonanza pilot should not have been imputed to them. We do not believe it necessary for us to express a view on this point. As we have explained, we are upholding the trial court's rulings that there was no actionable Government negligence.

**19.** "The Federal Tort Claims Act permits an indemnity action against the United States 'in the same manner and to the same extent' that the action would lie against 'a private individual in like circumstances' ....*" Lockheed Aircraft Corp. v. United States,* —— U.S. ——, ——, 103 S.Ct. 1033, 1038, 74 L.Ed.2d 911 (1983) (citations omitted).

Indemnity actions are permitted under Colorado law. *See Ringsby Truck Lines, Inc. v. Bradfield,* 193 Colo. 151, 563 P.2d 939, 942–43 (1977).

liable. *See Ringsby Truck Lines, Inc. v. Bradfield,* 193 Colo. 151, 563 P.2d 939, 942–43 (1977); *Millenson v. Department of Highways,* 41 Colo.App. 460, 590 P.2d 979, 982 (1978); *Bradford v. Bendix-Westinghouse Automotive Air Brake Co.,* 33 Colo. App. 99, 517 P.2d 406, 414–15 (1973). Thus the findings of the trial judge, which we sustain, support the judge's conclusion that the plaintiffs are not entitled to indemnity.

V

*Conclusion*

For the reasons stated, we are convinced that the plaintiffs have not demonstrated any reversible error in the findings and conclusions of the trial court. Accordingly the judgment is

AFFIRMED.

APPENDIX

DEPICTION OF DENVER TCA