James GIANUKOS and Pota Gianukos, Plaintiffs-Appellants,

v.

LOEB RHOADES & CO., INC., a Maryland corporation, and Loeb Rhoades & Co., a partnership, Defendants-Appellees.

No. 86–1203.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1987.

Decided June 2, 1987.

Steven J. Rotunno, Joyce & Kubasiak, P.C., Chicago, Ill., for plaintiffs-appellants.

H. Nicholas Berberian, Neal, Gerber & Eisenberg, Chicago, Ill., for defendants-appellees.

Before WOOD, CUDAHY and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiffs, James Gianukos and his mother, Pota Gianukos, were members of a class certified by the district court in a securities fraud case based on the fraud-on-the-market theory, against defendants Loeb Rhoades & Company, Inc. (a corporation) and Loeb Rhoades & Company (a partnership). Following class certification and some discovery, but before trial, the certified class and Loeb Rhoades entered into a settlement agreement. The agreement provided that Loeb Rhoades would pay eligible class members 65% of their net losses, up to an aggregate of $3,000,000. Tne agreement also provided, however, that Loeb Rhoades could take discovery and as- sert defenses against any class claimant asserting a loss greater than $50,000. One defense specifically mentioned in the agreement was the defense that the class claimant had primarily relied upon factors other than the integrity of the market in making his stock purchases.

The Gianukoses filed a claim against Loeb Rhoades in excess of $50,000. Loeb Rhoades contested the claim on the defense that the Gianukoses primarily relied upon factors other than the integrity of the market in making their stock purchases. The district judge agreed with Loeb Rhoades and denied the Gianukoses' claim in its entirety. The Gianukoses appeal the district court's denial of their claim against Loeb Rhoades. We affirm.

## I.  FACTUAL BACKGROUND

In 1982 Wayne Healy filed a securities fraud suit against Loeb Rhoades, a registered securities broker. Healy claimed, for himself and on behalf of a class of other stock purchasers, that Jack Bernhardt, a registered representative of Loeb Rhoades working out of the Chicago office, engaged in a fraudulent scheme to artificially inflate and maintain the price and trading volume of the stock of Olympia Brewing Company from June 1975 to April 1977. Healy alleged that Bernhardt accomplished this fraud in two ways. First, Bernhardt allegedly traded Olympia's stock among customers' accounts at Loeb Rhoades, creating an illusion of market activity in Olympia's stock. And second, Bernhardt allegedly misrepresented to Loeb Rhoades's customers that Olympia was the target of an attempted takeover by a foreign company.

James Gianukos and his mother Pota Gianukos purchased Olympia's stock during the relevant time frame. According to them, they followed their typical pattern of buying stocks based on market information when they purchased Olympia's stock. According to Loeb Rhoades, however, the Gianukoses' purchases of Olympia's stock were atypical—Loeb Rhoades contends the purchases were primarily motivated by the

receipt of "inside information" released by Bernhardt, a factor other than the integrity of the market.

## A. The Gianukoses' Story

James Gianukos was a lawyer, but he did not practice much law. Instead, he managed his family's restaurant business and made investments for himself and his mother, Pota Gianukos. For many years Mr. Gianukos had purchased and sold securities. He typically learned of potential investments by reading the financial press. Once he identified a potential investment, Mr. Gianukos would follow the price of the stock for a period of time and further investigate the investment by reading other financial publications. If he was favorably impressed, Mr. Gianukos would discuss the potential investment with his mother. Mrs. Gianukos sometimes accepted and sometimes rejected her son's investment recommendations.

Mr. Gianukos contends he followed this pattern of investigation before buying Olympia's stock. In late November or early December of 1976, Mr. Gianukos testified, he read about Olympia's acquisition of Lone Star Brewing Company. After becoming interested in Olympia's stock, Mr. Gianukos followed Olympia's price and trading volume, both of which were rising. He also testified he reviewed financial literature on Olympia, which opined that Olympia was a strong company with good future prospects.

On January 5, 1977, Mr. Gianukos purchased 1000 shares of Olympia through one broker and 1000 shares through another. Olympia's price rose slightly and two days later Mr. Gianukos bought 1300 additional shares of Olympia and his mother bought 700 shares. Olympia's price continued to rise and Mr. Gianukos made additional purchases of Olympia in January and again in March. On March 7th or 8th, however, Olympia's price dropped sharply. Mr. Gianukos sold 1000 shares of Olympia on March 8th. Later that day, however, Olympia's price rebounded to some degree and Mr. Gianukos repurchased the 1000 shares he had sold, plus an additional 100 shares. The following day, March 9th, Mr. Gianukos bought another 1000 shares. The Gianukoses' total investment in Olympia at this point amounted to $500,000, the largest single investment the Gianukoses had ever made.

But then Olympia's price dropped again. By the time the market in Olympia's stock stabilized, the Gianukoses had lost $238,000 of their original $500,000 investment. They contend this loss was caused by their reliance on the market, which unbeknownst to them had been manipulated by Bernhardt.

## B. Loeb Rhoades's Story

Loeb Rhoades, on the other hand, paints a very different picture of the Gianukoses' investments in Olympia's stock. This is a group portrait, Loeb Rhoades argues, of the Gianukoses' long-standing church acquaintances, business associates, and relatives passing Bernhardt's "inside information" about a potential takeover to make a killing in the market.

The Gianukoses were members of the St. Andrews Greek Orthodox Church in Chicago. Through St. Andrews, they had been acquainted for thirty to thirty-five years with the Papas family. Francis Papas was the mother of the family and a friend of Pota Gianukos's. Her three sons, Andrew, John, and Patrick, and her uncle, William Valos, and her son Andrew's father-in-law, A.T. Tsoumas, were the other members of the Papas family. Patrick Papas, like Mr. Gianukos, was engaged in the restaurant business.

Mr. Gianukos's law partner during this time was Peter Karas. Another one of Mr. Gianukos's acquaintances, Dr. Michael Jerva, had known Mr. Gianukos for ten or fifteen years.

Mr. Gianukos's brother-in-law, James Spirrison, was a neighbor of Bernhardt's and had known the Papas brothers for more than twenty years. Mr. Spirrison was also a neighbor of John Marks in the early 1970s. John Marks was acquainted with the Gianukoses through St. Andrews and had known them for thirty to thirty-five years.

On December 30, 1976, Bernhardt, the Loeb Rhoades representative, called Andrew Papas. Bernhardt told Papas that "big things" were happening with Olympia and that he would call Papas later when he returned from a trip to Germany.

Four days later, on January 3, 1977, Bernhardt called Papas again and told him the trip to Germany had been successful. Bernhardt asked Papas if he could raise "megabucks." The following day, January 4th, Bernhardt and Papas met at a restaurant. Bernhardt told Papas that a German company would take a substantial position in Olympia's stock within two weeks. Papas and Bernhardt met at the restaurant again the next day, January 5th. Papas gave Bernhardt two checks totalling over $560,000 in partial payment for 107,000 shares of Olympia's stock. Papas then went to see his father-in-law, A.T. Tsoumas, to discuss the impending takeover. Papas also called his mother's uncle, William Valos, to relay the same information about the takeover.

That same day, the Gianukoses made their initial purchase of 2000 shares of Olympia's stock. Half of this purchase was made through Mr. Gianukos's brother-in-law, James Spirrison. Peter Karas, Mr. Gianukos's law partner, also made his initial purchase of Olympia's stock on this day.

The following day, January 6th, various members of the Papas family infused a Papas family partnership with cash to finance the acquisition of Olympia's stock. Two members of the family, Patrick Papas and A.T. Tsoumas, met with Bernhardt at a restaurant. Bernhardt repeated to them his story of a German company's interest in acquiring Olympia.

The next day, January 7th, Andrew Papas met again with Bernhardt to deliver four checks totalling $1.9 million to cover the Papas's family purchases of Olympia's stock. That same day the Gianukoses bought 2000 more shares of Olympia and Mr. Gianukos's law partner, Peter Karas, bought another 500 shares.

The day following, January 8th, Andrew Papas discussed with other acquaintances, at the residence of his mother's uncle, William Valos, a potential takeover of Olympia. Two days later, Andrew Papas, his brother Patrick, his mother's uncle William Valos, Bernhardt, and others met to discuss a takeover of Olympia by Oetker, a German brewing company.

The next day, January 11th, after having a conversation with John Papas about the takeover, John Marks bought 500 shares of Olympia. Between this day and January 14th, four days total, the Gianukoses bought another 3000 shares of Olympia through Spirrison.

At some point during this time, Dr. Michael Jerva, a friend of Mr. Gianukos's for ten to fifteen years, bought Olympia's stock on Mr. Gianukos's recommendation. Dr. Jerva did not recall whether Mr. Gianukos mentioned the takeover. But when Dr. Jerva bought Olympia's stock on Mr. Gianukos's advice, he had to open a brokerage account with Mr. Gianukos's brother-in-law, James Spirrison, because Dr. Jerva did not have his own account with any broker.

After this point the frenzied purchases tapered off because Bernhardt told Andrew Papas the takeover was going to be delayed as a result of financing difficulties in Germany.

On March 3rd, however, Andrew Papas told William Valos that the takeover of Olympia would happen within a few days. That day Valos bought 550 shares of Olympia. Mr. Gianukos too bought 1000 additional shares and his law partner, Peter Karas, bought 300 shares.

Four days later, on March 7th, *Barron's* published an article suggesting that Olympia was not the target of a takeover attempt. Early the next day, March 8th, Mr. Gianukos sold 1000 shares of Olympia. After reading the *Barron's* article, Andrew Papas called Bernhardt. Bernhardt assured Papas that the deal was still on, with plans to acquire Olympia in the open market, rather than through a private transaction. Bernhardt told Papas the *Barron's* article had been planted by short sellers. Later that day the Gianukoses repurchased 1000 shares of Olympia, plus an additional

100 shares. The following day, March 9th, Mr. Gianukos bought another 1000 shares of Olympia.

After all of these purchases, the market for Olympia collapsed. The Gianukoses lost $238,000, of their original $500,000 investment, as a result of the collapse. They eventually pursued a claim against Loeb Rhoades to recover 65% of their loss pursuant to the settlement agreement.

## II. LEGAL STANDARDS

The Gianukoses challenge the district judge's denial of their claim against Loeb Rhoades. They make this challenge on three fronts.

Initially, they contend the district judge improperly shifted the burden of proof on Loeb Rhoades's defense from Loeb Rhoades to themselves. The imposition of a burden of proof, whether in the first instance or in a subsequent shift of the burden, is a legal determination. *See* G. Lilly, *An Introduction to the Law of Evidence* § 15, at 40–41 (1978). Because imposing a burden of proof is done as a matter of law, we undertake our review of such action by the district court *de novo*. *SEC v. Suter*, 732 F.2d 1294, 1300 (7th Cir.1984) ("An appellate court may properly conduct an independent review and resolution of questions of law determined by a district court. Conclusions of law made by a district court do not bind a reviewing court.") (citations omitted).

The Gianukoses also challenge the district judge's denial of their claim against Loeb Rhoades on the basis of improper factual findings. In denying their claim, the district judge made the key factual finding that "Mr. Gianukos, and hence his mother Pota Gianukos for whom he traded, primarily relied upon factors other than the integrity of the market when he purchased Olympia." The Gianukoses contend that key finding by the district judge is wrong.

On appeal, we cannot set aside a district court's findings of fact unless we conclude those findings are clearly erroneous. Fed. R.Civ.P. 52(a); *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428 (7th Cir. 1985) ("The district judge is manager of the entire swirl of facts, and the clearly erroneous rule is based in substantial measure on a belief that because appellate courts never are in a better position than the district court, and often are in a worse one, a substitution of judgment would increase the randomness of the process without increasing accuracy...."), *cert. denied,* —— U.S. ——, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986). And we can only draw the conclusion that a finding of fact is clearly erroneous if we are left " 'with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)).

We are further constrained in our review in this case because of the nature of the factual finding challenged by the Gianukoses—they challenge the district judge's determination of witnesses' credibility. The district judge explained:

> Notwithstanding Mr. Gianukos' denials and notwithstanding the denials of the other plaintiffs, this Court finds that Mr. Gianukos' testimony is not credible in view of the entire record, including but not limited to his trading pattern in the stock, the percentage of his net worth that his investment in Olympia represented, and his testimony that this was his largest investment in any stock.

In reviewing that finding of fact we are commanded that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a). As a result, we must be careful in our review to respect the district judge's factual findings, particularly her credibility determinations. As we explained quite some time ago:

> [The district judge] has the function of finding the facts, weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which he considers most reasonable, and he has the inherent right to disregard the testimony of any witness when he is satisfied that the witness is not telling the

truth or her testimony is inherently improbable due to its inaccuracy, uncertainty, or interest or bias.

*Sun Life Assur. Co. v. Stacks,* 187 F.2d 17, 20 (7th Cir.1951); *United States v. DeRobertis,* 766 F.2d 270, 273 (7th Cir.1985) ("[Appellant] relies essentially on the proposition that because the deponents' statements were uncontradicted the judge was required to credit them. This is not the law. A judge may disbelieve testimony, and he may do this even without giving reasons."), *cert. denied,* — U.S. —, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986).

Finally, the Gianukoses argue that "[t]here is not one shred of evidence to link Mr. Gianukos's purported knowledge of an Olympia takeover to Mrs. Gianukos." Because there is no link, the Gianukoses argue, Mrs. Gianukos's claim should be paid even if her son's claim is denied.

Apart from noting that Mrs. Gianukos lived with her son and discussed all her investments with him, however, Loeb Rhoades argues this issue was not raised in the district court. Our review of the record and the Gianukoses' failure to counter this contention in their reply brief or at oral argument convince us that the issue was not raised at trial. It is well settled that arguments not raised at trial are waived on appeal. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 338 (7th Cir.1987); *Textile Banking Co. v. Rentschler,* 657 F.2d 844, 853 (7th Cir. 1981). In any event in view of all the evidence in the case the claim would have no merit.

## III. DISCUSSION

The Gianukoses argue two main points on this appeal. First, they contend the district judge improperly shifted the burden of proof on Loeb Rhoades's defense from Loeb Rhoades to themselves. And second, the Gianukoses complain that the district court's findings of fact are clearly erroneous.

### A. Burden of Proof

■ The Gianukoses are class claimants against Loeb Rhoades for losses they incurred in purchasing Olympia's stock. The losses allegedly were caused by reliance on the integrity of the market. As claimants under the settlement agreement, the Gianukoses have the burden of showing that they were purchasers of Olympia's stock during the relevant period of time and that they lost money in making those purchases. This showing sufficiently establishes an appropriate claim against Loeb Rhoades. But once a claim is properly established, Loeb Rhoades has the opportunity to defend against it by showing that the claimant primarily relied upon factors other than the integrity of the market in purchasing Olympia's stock. As recognized by the district judge in her written order, Loeb Rhoades has the burden of proof in asserting that defense:

> The burden is on Loeb Rhoades to demonstrate by a preponderance of the evidence that the particular claimant primarily relied on factors other than the integrity of the market with respect to his or her Olympia transactions.

The Gianukoses established an appropriate claim against Loeb Rhoades. They purchased Olympia's stock during the appropriate time and they lost $238,000 in making those purchases. Loeb Rhoades then asserted the defense that the Gianukoses primarily relied on Bernhardt's "inside information" about a potential takeover, received from friends and associates, in making their purchases, rather than on the integrity of the market. The district judge specifically stated that Loeb Rhoades had the burden of proving that defense. And based on all the evidence, the district judge found that Loeb Rhoades met its burden of proving the defense and accordingly held that the Gianukoses' claim against Loeb Rhoades must fail.

The Gianukoses complain, however, that the district judge improperly shifted the burden of proving the defense from Loeb Rhoades to themselves to disprove the defense. They base this complaint on a colloquy that occurred between the district judge and the Gianukoses' attorney toward the conclusion of Mr. Gianukos's cross-examination at trial. The district judge indi-

cated that she was interested in knowing more about Mr. Gianukos's net worth in light of his investment of $500,000 in a single over-the-counter stock within a two-month period of time.[1] She subsequently questioned Mr. Gianukos about his trading practices and his financial wherewithal.

The Gianukoses contend the district judge's statements and actions were improper. They argue that their wealth is irrelevant in determining whether or not they primarily relied on a factor other than the integrity of the market. They correctly note that Loeb Rhoades has the burden of proving that primary reliance. They also point out that they do not have the burden of proving they were sufficiently wealthy to invest that amount of money in a single stock in so short a period of time. Finally, the Gianukoses assert that an investor need not be wealthy nor the recipient of a tip to buy stock—an investor may feel lucky, may have a hunch, may be irrational, or may even be just plain dumb in deciding to invest in a particular stock.

As an initial matter, we note that "[t]he court may interrogate witnesses, whether called by itself or by a party." Fed.R.Evid. 614(b). The Gianukoses cannot complain that the district judge's mere questioning of Mr. Gianukos was improper. Neither do we believe that the district judge's comments during the colloquy with counsel amounted to a shifting of the burden of proof. In her written, final order, the district judge clearly stated that Loeb Rhoades must shoulder the burden of proving its defense against the Gianukoses' claim. There is no indication in her ruling that the Gianukoses would have to disprove the defense.

Moreover, the district judge's comments during the colloquy indicate a willingness on her part to discover any defects in Loeb Rhoades's defense against the Gianukoses. In light of all the evidence before her, the district judge opined that Loeb Rhoades's evidence in support of its defense was

---

1. This is the colloquy between the district judge and the Gianukoses' two counsel:

> THE COURT: Well, let me tell you both two areas of inquiry that have not been explored and in which I'm quite interested.
>
> It seems to me a person who puts $500,000 —or a family—into a stock over this period of time has got to be either spinning the wheel, in which case he's very, very, very wealthy, or he knows something.
>
> And I am interested in knowing how wealthy the plaintiff is so I can put this purchase in perspective.
>
> \* \* \* \* \* \*
>
> THE COURT: Well, am I going to do all of this arithmetic? I'm faced with an enormous amount of money on the line by a person I know nothing about.
>
> He owns some restaurants, he's a lawyer but he doesn't practice—I don't even know if he went to college. There's a lot I don't know about this man.
>
> On the face of these facts—
>
> MR. JOYCE: I'll ask a few more questions, your Honor.
>
> THE COURT: I think you ought to.
>
> I wouldn't put out $500,000 of family money unless I thought I knew something or unless I had an awful lot of money to play with and it was my practice to play with it in that way.
>
> MR. JOYCE: But, you see, I think that's really unfair, because you've had six or seven or eight years of this case where you've heard about what's going on.

> This fellow bought in the market without any indication, any knowledge of Bernhardt or Bernhardt's customers. He's obviously a wealthy individual.
>
> THE COURT: Well, I don't know that. I don't know that.
>
> \* \* \* \* \* \*
>
> THE COURT: So I just don't know people who go out and play with money in the stock market unless they're very wealthy or they—it's their business, or they think they know something. I think those are the three choices.
>
> Now he's told me he's an active investor. I don't know that—if that's enough. I mean, I really think you have to deal with this, Mr. Rotunno, and I would urge you to ask more questions.
>
> MR. ROTUNNO: Judge, we will. Just—just so I can have—just one comment to that. It's really not our burden here to show that the man is wealthy and could afford to do it.
>
> THE COURT: All right, Well, Loeb Rhoades has proved that in three months he drops half a million dollars into a stock. And I think you've got to take that into account.
>
> Those are devastating facts. How, just simply because of my own sense of how people invest their money. And unless he's going to fall into some sort of category that I can understand, that's a pretty devastating fact all by itself.

"devastating." She encouraged Mr. Gianukos's counsel to help her determine whether Mr. Gianukos was a "wealthy man" as Gianukoses' counsel claimed he was. Apparently the district judge believed that unless Mr. Gianukos could show he was very wealthy or dealt in securities as a business, the overwhelming evidence of Mr. Gianukos's buying such a large quantity of stock in such a short period of time, at the same time his friends were buying massive amounts of the same stock because of an inside tip, would prove he relied on Bernhardt's "inside information" and defeat his claim against Loeb Rhoades.

Far from shifting the burden of proof to the Gianukoses' disadvantage, the district judge attempted to elucidate all relevant evidence bearing on whether Mr. Gianukos bought Olympia's stock by relying on the integrity of the market or whether he bought it because he thought he was privy to inside information. Consequently, we conclude that the district judge articulated and applied the appropriate burden of proof and that her comments during the colloquy with counsel were intended to help her make an informed decision, not to shift the burden of proof.

## B. Findings of Fact

■ The Gianukoses also contend that the district judge's findings of fact are clearly erroneous. Specifically, they challenge the district judge's finding that when the Gianukoses purchased Olympia's stock, they primarily relied on Bernhardt's "inside information" and not on the integrity of the market. The district judge made this finding against Mr. Gianukos based on all the evidence before her, "including but not limited to his trading pattern in the stock, the percentage of his net worth that his investment in Olympia represented, and his testimony that this was his largest investment in any stock."[2]

The Gianukoses object to this finding mainly because the testimony offered by Mr. Gianukos and others showed that Mr. Gianukos never spoke to his friends or associates about a potential takeover of Olympia. The Gianukoses argue that this evidence was uncontradicted and that their purchases of Olympia's stock were consistent with their prior trading behavior.

But even though Mr. Gianukos and others testified they never spoke about a takeover of Olympia, the district judge "has the inherent right to disregard the testimony of any witness when he is satisfied that the witness is not telling the truth or her testimony is inherently improbable due to its inaccuracy, uncertainty, or interest or bias." *Sun Life Assur. Co. v. Stacks*, 187 F.2d 17, 20 (7th Cir.1951). Moreover, the circumstantial evidence to the contrary was overwhelming. Circumstantial evidence in this situation is as probative as direct evidence and may come close to establishing

---

2. The district judge's comments during her oral ruling, delivered before she issued the written order, are illuminating:

THE COURT: Under the settlement agreement, the burden is clearly on Loeb Rhoades to establish that a particular claimant did not primarily rely on the integrity of the market, and in fact primarily relied on other factors.

I think that Loeb Rhoades has established this burden with respect to the Gianukis [sic] claim in its entirety.

I know that Mr. Gianukis [sic] took the stand and affirmatively denied trading on information that he had from any source that Olympia was going to be a takeover candidate, and in fact was a takeover candidate.

Notwithstanding those denials, I simply cannot accept that testimony in view of the trading pattern, in view of the percentage of his net worth that his total investment represented, in view of the fact that this was the largest investment that he had.

I've studied the record very carefully, because I know that Mr. Gianukis [sic] took the stand and denied relying on factors other than the integrity of the market. But I simply cannot accept that testimony in view of the entire record that demonstrates his trading pattern.

It is absolutely consistent with only one conclusion, and that is that Mr. Gianukis [sic] believed that Olympia was going to be a takeover candidate. And even the fact that he purchased when the price was on the decline, again, consistent with other trading patterns that I have seen in the case and that are part of the record on this claim.

All of that is consistent with his belief that Olympia Brewing was a takeover candidate. So I have concluded that Mr. Gianukis [sic] and hence his mother for whom he traded primarily relied upon factors other than the integrity of the market.

facts directly contrary to attempted explanations. *United States v. Towers*, 775 F.2d 184, 188 (7th Cir.1985); *Tcherepnin v. Franz*, 485 F.2d 1251, 1259–61 (7th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974).

As factfinder, the district judge was permitted to find that the testimony of Mr. Gianukos was self-serving and that the testimony of the others was biased. She was also permitted to infer from all of the evidence, direct and circumstantial, that the Gianukoses relied on Bernhardt's "inside information" about the takeover, rather than on the integrity of the market, in purchasing Olympia's stock.

The district judge's findings were not clearly erroneous. Rather, the evidence amply supported them. The Gianukoses' explanation for their purchases of Olympia's stock was that their investment typified "trading in a security that occurs every day." But the district judge's finding was not clearly erroneous in concluding that the Gianukoses' explanation was inherently incredible. The Gianukoses' investment in Olympia's over-the-counter stock represented one-half of the family's entire net worth. It was the largest single investment the Gianukoses had ever made. The investment was made in a mere two-month period of time. Moreover, long-time friends and associates of the Gianukoses were purchasing the same stock, on the same days, and were soliciting others to do the same, based on their receipt of Bernhardt's information about Olympia's alleged takeover.

Based on all of this evidence, we cannot say that the district judge's findings against the Gianukoses were clearly erroneous.

## IV. CONCLUSION

The Gianukoses brought a claim against Loeb Rhoades for a loss they incurred in purchasing Olympia's stock. Because the district judge found that the Gianukoses had primarily relied on Bernhardt's "inside information," a factor other than the integrity of the market, their claim against Loeb Rhoades was denied. We hold that in de-

nying the Gianukoses' claim the district judge did not improperly shift the burden of proving Loeb Rhoades's defense from Loeb Rhoades to the Gianukoses. We also hold that the district judge's findings of fact against the Gianukoses were not clearly erroneous. Finally, we hold that because the Gianukoses failed to raise at trial the argument that Mrs. Gianukos's claim was separate from her son's, it is waived on this appeal.

As a result, the decision of the district court to deny the Gianukoses' claim is

AFFIRMED.