**Gordon H. BARTSH, et al.,**
**Plaintiffs–Appellants,**

v.

**NORTHWEST AIRLINES, INC.,**
**Defendant–Appellee.**

**No. 86–1891.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1987.

Decided Sept. 21, 1987.

As Amended Sept. 23, 1987.

---

Alan M. Serwer, Bell, Boyd & Lloyd, Chicago, Ill., for plaintiffs-appellants.

Joseph J. Hasman, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for defendant-appellee.

Before EASTERBROOK and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Appellants in this case sought an adjudication that the defendant had violated the terms of a consent decree to which the parties had earlier agreed in settlement of appellants' age discrimination claims against the defendant. Following a lengthy hearing, the district court held that the appellants had not established any violation of the consent decree by the defendant. Appellants claim both that the district court misinterpreted the consent decree and that the district court's factual findings were insufficient and, in some cases, clearly erroneous. Because we conclude that the district court correctly interpreted the consent decree and that its findings are sufficient and not clearly erroneous, we affirm.

I

This case began as one of a number of actions brought under the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. §§ 621 et seq., in the late 1970s and early 1980s. The actions sought generally to force the nation's commercial airlines to allow pilots who had reached age 60 (and therefore were precluded by federal regulations from flying commercial airliners as either a Captain or First Officer) to continue their employment as Second Officers (also sometimes referred to as Flight Engineers). As evidenced by the reported decisions, e.g., *Western Airlines, Inc. v. Criswell*, 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985), these actions were generally successful. In 1983, as a result of what it saw as the trend in judicial decisions in the area, the defendant, Northwest Airlines, Inc. ("Northwest"), decided to abandon its "age 60 rule" as that rule applied to the Second Officer position and settle the claims of the then 37 plaintiffs who had joined the lawsuit. One of the results of the settlement negotiations was a consent decree that permitted any of the 37 plaintiffs who so elected to receive training from Northwest in the Second Officer position on the Boeing 747 aircraft (most had been 747 Captains at the time of their terminations). Northwest agreed to provide each plaintiff electing training with "the usual and customary training provided its Second Officers" and "to make its best efforts to train plaintiffs to proficiency as Second Officers, giving due regard for time spent out of service." Consent Decree entered April 1, 1983 ¶ 4(d).

The Second Officer position is dramatically different from that of Captain. The Captain (and the First Officer) actually

flies the airplane. The Second Officer, on the other hand, performs technical tasks such as the monitoring and in flight maintenance of the various systems necessary to safe takeoff, flight and landing of the aircraft. For example, the Second Officer is responsible for fuel management, engines, hydraulics, and cabin pressurization. The Second Officer also has more mundane duties such as maintaining proper air conditioning in the cabin and turning on and off the "no smoking" and "fasten seat belt" signs at appropriate times. The Second Officer is primarily responsible for dealing with a number of emergencies that can, if not handled properly, lead to disastrous results. For example, the Second Officer is responsible for dealing with engine fires, wheel well fires, and for restarting a failed engine.

The training program commenced April 18, 1983 and was scheduled to be completed June 30, 1983. Thirty-three of the original thirty-seven plaintiffs elected to be retrained under the consent decree. For the sake of convenience, we will refer throughout this opinion to those thirty-three as "the returning group" or "the returning pilots." Of that group, eight withdrew from the training program before its completion, sixteen successfully completed the training program, and nine had their training terminated. Appellants here are seven of those nine.

The training consisted of two parts. First, the returning pilots were given an eleven-day[1] "ground school," a classroom environment where they were taught general aspects of Northwest's standard operating procedures and familiarized, in a general way, with the aircraft and the Second Officer position. During this portion of their training, they received instruction in "flow patterns" (the order in which a Second Officer is expected to check the various gauges, switches and controls on the Second Officer panel) and "gross weights" (specifically, how to determine the allowable gross weight for take off and landing using a chart). Also as part of ground school, the returning pilots were given "cockpit procedures training" in a simulator.[2] Finally, the plaintiffs were given simulated "flight" training in a flight simulator. A flight simulator is a mechanical replica of a 747 cockpit. It is aided by a computer to simulate various flight conditions and the effects of manipulating the controls. In sum, the simulator reproduces, as nearly as possible, the actual operation of a 747 aircraft. Northwest uses a flight simulator for most of its training of Captains, First Officers and Second Officers, because the device allows the demonstration and evaluation of certain emergency procedures that could not safely be performed in an aircraft.

Toward the end of simulator training, a trainee is given a "pre-check" in which he is evaluated on many of the systems he has covered separately and in depth in previous simulator sessions. The pre-check is successfully completed if the trainee shows sufficient proficiency at all of the various tasks to convince the instructor that the trainee will pass a "proficiency check." Accordingly, upon successful completion of a pre-check, a proficiency check is scheduled. A proficiency check is essentially a "pass-fail" examination in which the trainee is required to demonstrate his ability to

---

1. Several of the 33 were given an abbreviated version of ground school because they had been out of service less than a year. Of the present appellants, only William Howard was given the abbreviated course. Of those given the abbreviated course, one withdrew before the completion of training, two were terminated by Northwest, and two successfully completed the program. All passed the written examination given at the end of ground school.

2. While the "cockpit procedures training," like the later "simulator training," took place in a flight simulator, the two were distinct. During the "cockpit procedures training" the simulator was not actually "flown" but rather was used as a model to explain and demonstrate certain standard procedures.

perform various normal and emergency procedures. If the trainee fails the proficiency check, Northwest often prescribes more training and a re-check. If the trainee passes the initial proficiency check or a re-check, he will be assigned to "initial operating experience," which consists of actually flying as a Second Officer on an aircraft, with passengers, under the supervision of a "check airman" who is a designee of the Federal Aviation Administration ("FAA"). If the check airman, after an appropriate period of supervision and a "line check", certifies that the trainee has the requisite level of proficiency, the trainee is released to unsupervised "line flying."

The appellants had considerable difficulty in their training. First, the returning pilot group as a whole had considerable difficulty with gross weight calculations, so much so that Northwest created a supplementary two day course in the subject. Secondly, the group had difficulty with the flow patterns required to be used in the Second Officer position. Proper use of flow patterns is crucial to the position because it insures that the Second Officer will check each of a myriad of controls and indicators on his panel and make any necessary readjustments. If flow patterns are not used or are used improperly, the Second Officer could fail to detect a problem at a time when it could be easily corrected. A third area of difficulty for the returning group was in the proper use of checklists. A checklist consists of a series of standard responses which Northwest has developed for various normal and emergency flight situations. The checklist is used to ensure that the Second Officer (and, in many cases other members of the crew) performs the necessary functions to solve particular flight problems. Again, improper use of the checklist can result in the omission of crucial steps.

Appellants contend that there were numerous deficiencies in their training. Initially, they contend that the general atmosphere of the training program was one of hostility toward them. They attribute this, in part, to the views of the head of pilot training at Northwest, Captain Nelson. At the initial meeting of the returning pilot group, he commented that "there is such a thing as reincarnation after all" and stated his view that, like Captains and First Officers, Second Officers should not be allowed to fly commercial airplanes beyond age 60. Additionally, appellants believe the instructors, most of whom were active Northwest Second Officers who would be junior in seniority to appellants, were also hostile because they feared that appellants would be able to "bump" them from their positions on the 747 to a less desirable position on another aircraft. According to one of the appellants, an instructor made a comment, when a trainee borrowed the instructor's pen, to the effect that "it's bad enough you're taking my job, do you want my pen too." According to the appellants, the instructors were generally unfriendly and on occasions refused to answer questions asked by the trainees.

Additionally, appellants complain that they were not provided a syllabus of the training and therefore did not know what to expect at each simulator session. According to them, the training program was disorganized, and they were occasionally recorded as having learned and performed a particular task although they had only observed another trainee doing so. Appellants also cited numerous specific examples of simulator sessions that seemed particularly unproductive. In several, there were simulator malfunctions. In one session, appellant Bartsh claimed he was given a pre-check in a "Model 200" simulator, with which he was unfamiliar and that he became disoriented when the instructor introduced a complete electrical failure. In another, an instructor's twelve-year-old son was allowed to "fly" the simulator in the Captain's seat. In many of the sessions, there was not a full crew, which appellants claim resulted in a lack of realism. Many of the sessions were allegedly cut short, particularly lacking "pre-briefing" and "debriefing" in which the instructors would discuss the tasks to be performed that ses-

sion and the mistakes which had been made, respectively.

Perhaps the central focus of appellants' case was the contention that their training had been terminated "prematurely" and "arbitrarily" when they failed to reach proficiency in a certain pre-determined number of simulator hours. They were never informed that there was a time limit to their training by their instructors, nor were they informed of the amount of time that had been charged to them at any given point in the training. It was only after they were informed by Northwest that their training was terminated for "high time," "failure to progress," and in some cases "failing a proficiency check" and commenced this enforcement action, that they learned of the limit. Some of appellants claimed that they were charged for more instruction time than they actually received. All testified that they believed they could pass a proficiency check and qualify as a Second Officer if only they had a few more hours of training.

Northwest's witnesses presented a dramatically different picture of the training. The instructors testified that Nelson had told them in an instructors' meeting that they were to put forth their best effort in retraining the appellants. They also testified that the training they gave the appellants was the same as the training they usually gave Second Officer trainees except that they worked harder at training the appellants because they seemed to have so much difficulty learning the Second Officer position. They further testified that they never charged a trainee for more instruction time than actually received and, usually, conservatively estimated the time used. They testified that the appellants' performance was generally poor and in some cases "the worst [they] had ever seen."

In addition to testifying that the training they gave the returning group was as good or better than any they had ever given, the instructors responded to some of appellants' specific criticisms. They testified that while there was not a written syllabus (nor had any previously been used in Northwest training programs), the training followed an established pattern contained in the instructors' manual. This pattern, in turn, essentially covered the various systems of the aircraft in the order of the Second Officer's standard flow pattern, a copy of which was reproduced in the appellants' training manual. Additionally, they testified that they orally informed trainees at the end of each simulator session about the subjects that would be covered during the next session.

The instructors also testified that, while training with a full crew in the simulator was desirable in later stages of the training, it was preferable to "split off" the Second Officer's panel during initial training sessions, so that he could focus on learning his own tasks without having to try to keep up with the Captain and First Officer in a coordinated crew situation. The instructors also testified that they gave the appellants the customary pre-briefing and de-briefing, although they disputed appellants' claim that normally there was to be an hour of each. As a general rule, according to the instructors, the pre-briefing consisted of a half-hour preview of the session and a pre-flight check (one of the Second Officer's routine duties in preparing for a flight) that took up to an additional half-hour. The de-briefing, according to the instructors, would vary widely, depending on the session, and could be as short as ten minutes or as long as an hour.

The "Pilot Review Board" was the body at Northwest responsible for reviewing the training progress of Second Officer candidates and prescribing a course of action. Various members of the Board testified at trial. They denied that there was a specific time limit to the training, although they did admit that the amount of progress a trainee had made was considered in light of the amount of training he had received. According to the Board members, the decision to terminate a trainee's training was made in light of the progress the trainee had made and whether he was showing continued progress or actually appeared to be regressing in his learning. The Board considered the trainee's entire training file,

which included separate instructors' reports for each simulator session, in making a determination whether further training was appropriate or whether training should be terminated. Members of the Board testified that the appellants could not be considered safe to fly as Second Officers even if ultimately trained to pass a proficiency check.

Those instructors and company officials who had allegedly made disparaging remarks about the returning group testified that the remarks had been made in jest and that they had been met with laughter from the returning group. Additionally the instructors testified that, while the returning group would be senior to them in receiving flight assignments, this fact did not affect the quality of training they gave appellants. Several instructors testified that they had "trained [themselves] out of a job" on previous occasions. Additionally, company officials testified that the returning group arrived during a period of expansion at Northwest and that they were therefore needed and welcomed. The expansion would also mitigate any impact on Second Officers junior to the returning group, a fact the company pointed out in an open letter to the company's entire pilot workforce.

After reviewing the extensive testimony at the hearing (the hearing lasted two weeks and produced a transcript in excess of 2000 pages) and considering over 100 exhibits, the trial court ruled, in an oral opinion, that the appellants had not shown that Northwest violated the consent decree. According to the district court "Northwest has not failed to make its best efforts to train plaintiffs to proficiency as Second Officers, giving due regard for their time

spent out of service, in willful violation of the terms, spirit and intent of the consent decree." Tr. 2298. The district court based this conclusion on several subsidiary findings, which we discuss *infra*. According to the court "In the end, the Court's decision comes down to its conclusion on the question of whether Northwest Airlines gave the plaintiffs enough instruction to see if they could qualify for the Second Officer position.... I have concluded that the plaintiffs have not proven that additional time should be granted by clear and convincing evidence...." [3]

Accordingly, the district court denied relief. Plaintiffs appealed.

**II**

■ Appellants initially contend that the district court misinterpreted the consent decree as a matter of law by holding that it required Northwest only to give them "enough time to see if they could qualify." According to appellants, the decree requires that Northwest train each and every one of them "to proficiency" no matter how long it takes. We must reject this contention.

To begin with, we believe appellants' argument rests on a misunderstanding of the district court's oral opinion. By finding that the appellants had been given "enough time to see if they could qualify" the district court necessarily (and more precisely) meant that they had been given enough time for Northwest to determine that they *could not* qualify. In other words, the serious deficiencies in appellants' performance and the lack of progress, given the stage in their training, allowed Northwest to conclude that further training would be fruitless.

**3.** Appellants contend that the district court assigned them an additional and incorrect burden of proof. However, it is settled that a party asserting a violation of a consent decree has the burden of proving the violation by clear and convincing evidence. *Shakman v. Democratic Organization of Cook County,* 533 F.2d 344, 351 (7th Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976); *see also Hayden v. Oak Terrace Apartments,* 808 F.2d 1269, 1270 (7th Cir.1987). The district court's finding that appellants did not prove that additional time

should have been granted was intimately bound up with its determination of whether there had been a violation. The appellants' contentions, below and in this court, were essentially that the decree required that Northwest provide them at least as much time as it had ever provided any applicant in order to provide its "best efforts" and "usual and customary" training. The district court simply found that they had not proved that Northwest's actions were less than "usual and customary" and its "best efforts."

We do not believe this conclusion by the district court amounted to an erroneous interpretation of the consent decree. The decree by its terms required Northwest to use its "best efforts to train plaintiffs to proficiency." We certainly have no difficulty with appellants' contention that "best efforts" means "an obligation to act with good faith in light of one's own capabilities." *Bloor v. Falstaff Brewing Co.*, 601 F.2d 609, 613 n. 7 (2d Cir.1979) (citing *Van Valkenburgh v. Hayden Publishing Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972)); *see also Western Geophysical Co. v. Bolt Associates*, 584 F.2d 1164, 1171 (2d Cir.1978) ("best efforts" indicates a degree of discretion rather than an absolute requirement and requires "active exploitation in good faith"). Nor do we believe that the district court's interpretation of the decree was contrary to this understanding. The district court found that Northwest accepted the consent decree and sought to comply with it and that it devised a special training program for appellants that provided them with more training time than was customary and treated the appellants fairly in their training.

A "best efforts" requirement necessarily presupposes that, in some cases, even the "best efforts" will fail to achieve the ultimate goal. *Western Geophysical*, 584 F.2d at 1171 ("best efforts" does not impose an absolute requirement). Other portions of the decree likewise contemplated that some of the plaintiffs would not ultimately be trained to proficiency. *See, e.g.*, Consent Decree ¶ 3(d) ("nothing contained herein shall be construed to obligate Northwest to retain any plaintiff ... who fails to meet qualification and proficiency requirements for the Second Officer position"). Best efforts certainly did not require the continued expenditure of time and money when it became obvious that further training attempts would be futile. Thus, we agree with the district court that providing appellants with "enough time to see if they could qualify" satisfied defendant's obligations under the consent decree.

### III

We also reject appellants' contentions that the factual findings of the district court were insufficient or clearly erroneous.

### A

Under Fed.R.Civ.P. 52(a) the district court, in a case tried without a jury, is required to set out its findings of fact and conclusions of law.[4] The purpose of this requirement is twofold: (1) to provide appellate courts with a clear understanding of the basis of the trial court's decision, and (2) to aid the trial court in considering and adjudicating the facts. *Colorado Flying Academy, Inc. v. United States*, 724 F.2d 871, 877 (10th Cir.1984), *cert. denied*, — U.S. —, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986); *Gupta v. East Texas State University*, 654 F.2d 411, 415 (5th Cir.1981). Accordingly, such findings are adequate if they are sufficiently comprehensive to disclose the steps by which the trial court reached its ultimate conclusion on factual issues. *Lodges 743 and 1746, International Association of Machinists and Aerospace Workers v. United Aircraft Corp.*, 534 F.2d 422, 433 (2d Cir.1975), *cert. denied*, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976). As we recently noted:

> While a trial court making findings of fact "need not indulge in exegetics, or parse or declaim every fact and nuance and hypothesis," ... it is necessary "to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." ... Therefore, the findings of fact must "include as many of the subsidiary facts as are necessary to disclose to the re-

---

4. Fed.R.Civ.P. 52(a) provides, in pertinent part:

   In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon ... and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of the action.... It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court.

viewing court the steps by which the trial court reached its ultimate conclusion on each factual issue."

*Monarch Beverage Co., Inc. v. Tyfield Importers, Inc.,* 823 F.2d 1187, 1192 (7th Cir. 1987) (citations omitted).

■ We believe that the district court's findings, while they could have been more complete, satisfy this standard. In an oral opinion [5] consuming approximately eight and one-half transcribed pages, the district court made the following findings:

... [T]he Second Officer position ... is a very important position, especially with respect to flight safety.... Obviously, thoroughness in the procedures, ability to think and reach quickly, are all vital to safety, and of course, the proper proficiency of a Second Officer requires a good memory.

[T]herefore, ... it is most important that the training and proficiency standards for a Second Officer should not be reduced to qualify plaintiffs by reason of the consent decree in this case of the circumstances under which this case has arisen.

... [I]n each case the plaintiffs had approximately a three to five week training period and ... each of the plaintiffs was given simulator training time materially in excess of the average for new pilots training for a Second Officer position on a 747.

... [A]ll plaintiffs were previously experienced 747 Captains, and, in the case of Mr. Scott, an experienced 747 Second Officer.

... [T]he skills required for Second officers are different than skills required for pilots.

... [I]ndividuals are affected by age at different rates and in different ways, which can affect training results and training failure rates.

While plaintiffs have testified to various perceived and actual shortcomings in their training, the Court finds such shortcomings are, essentially, minor and did not result in their training programs falling short of the level required by the consent decree.

\* \* \* \* \* \*

The Court is impressed by, and found credible and believed, the testimony of the various company instructors in this case.

The pilot flight reports for each of the plaintiffs revealed that each was having difficulty over the training period.... [T]hese reports—the training jacket and all of the material within the training jacket—indicates that the individuals showed that they were having serious difficulties in learning and remembering necessary details during their training program.

Moreover, the Court finds that some who failed their Proficiency Check rides did so in a very convincing manner.

... [T]he company clearly gave plaintiffs more than their usual and customary training for new hires for the Second Officer position on the 747. A special training plan was developed, which took into account the plaintiffs' time out of service.

... [T]he company and its officers and instructors did treat the plaintiffs fairly in their instruction and training of them.

While the various individual company officials and instructors may have adverse opinions on the wisdom of the Court's decision in this area permitting over-sixty Second Officers in the cockpit, ... those individual opinions did not prejudice the training efforts involving the plaintiffs.... [A]ll involved in training the plaintiffs in this case accepted the Court decree, whether they agreed with it or not, as the law binding upon them and sought to comply with it.

\* \* \* \* \* \*

**5.** While we realize that an oral opinion containing the court's findings of fact and conclusions of law is specifically contemplated by Rule 52(a), *see supra,* n. 5, and it may well be appropriate in cases that are not factually complex, we do not encourage its use in cases, such as this one, where the facts are relatively complicated. Nonetheless, as indicated in the text, we believe the district court's oral opinion here was sufficiently comprehensive to reveal its factual analysis and enable us to review the decision.

Now, in addition, the Court finds, then, that the company and its officers and instructors provided the plaintiffs with the usual and customary training provided its Second Officers and made their best efforts to train plaintiffs to proficiency as Second Officers, giving due regard for time spent out of service. Tr. 2294–96.

We believe that the trial court's findings resolved the critical factual issues, i.e., whether Northwest provided its "usual and customary" Second Officer training and put forth its "best efforts" in doing so. En route to these ultimate findings, the district court discussed and resolved important subsidiary issues, such as whether additional time would have done any good, whether Northwest officials and instructors endeavored in good faith to comply with the decree, whether appellants indeed received more instruction than Northwest normally accorded Second Officer trainees, and whether there were any major deficiencies in appellants' training. The district court credited, in a general way, the testimony of the company's instructors, and, while it certainly would have been helpful had the district court resolved specific issues over which there was a credibility contest (e.g., the intent with which certain allegedly disparaging remarks were made, the normal and actual situation with regard to pre-briefing and debriefing, whether appellants were told what to expect in advance of each simulator session, and whether they were overcharged or undercharged for simulator time), the caselaw makes clear that this is not required. Thus, while the findings are perhaps more skeletal than we would ordinarily like in a case of this complexity, we believe they are sufficient to meet the standards of Rule 52(a).

## B

■ Appellants also contend that certain of the trial court's findings are clearly erroneous. In addition to challenging the district court's ultimate findings that Northwest employed its best efforts and provided its usual and customary training, appellants appear to challenge certain of the district court's subsidiary findings. In particular appellants claim that the trial court's finding that "a special training program was developed which took into account plaintiffs' time out of service" lacks support in the record. They similarly assail the district court's finding that age can affect training results and failure rates, and that the ability to think and react quickly is vital to safety. We conclude that none of these findings is clearly erroneous.

A finding of fact may be overturned as clearly erroneous " 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 495, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)); *see also Gianukos v. Loeb Rhoades & Co.*, 822 F.2d 648, (7th Cir.1987) (quoting *Anderson*). This standard does not entitle us to reverse the finding of the lower court merely because we are convinced that we would have decided the case differently in the first instance. *Anderson*, 105 S.Ct. at 1511. Furthermore, where the district court's findings are based on its decision "to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* 105 S.Ct. at 1513; *see also Gust K. Newberg Construction Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1365 (7th Cir.1987). Under this standard of review, we must uphold the district court's factual findings.

The heart of appellant's contentions regarding the purported errors of the district court is that Northwest violated the consent decree by imposing an "arbitrary" time limit on their training, terminating it "prematurely." According to the appellants, this action violated both the "usual and customary" and "best efforts" terms of the decree. However, the district

court's finding that the company provided appellants enough time to see if they could qualify negates any contention that a particular time limit was imposed. We do not find the district court's ultimate findings on the "best efforts" and "usual and customary" issues clearly erroneous because, like the district court, we do not believe that appellants have shown that any such arbitrary limit existed.

Company officials responsible for the training program and the decisions to terminate appellants' training uniformly testified that no particular time limit was imposed. Instead, each trainee was individually considered and, in many cases, additional training was prescribed. While the decisions took the trainees' simulator time to date into account, it did so only as a way to evaluate the progress made, or, more accurately *not* made.

Appellants rely upon the variability of the times at which training was terminated for members of the returning group, but this very evidence refutes their contention that an absolute time limit was imposed. Appellant Scott, who had actually been a 747 Second Officer for four years, was terminated after 25 hours of simulator time. At that point, he had failed a check ride, which the instructor giving the check testified was the worst he had ever seen, and had been given an additional period of instruction after which the instructor commented "Insufficient to recommend another check ride after today. More time would be required if warranted. [The Trainee's] 4 years on 747 [Second Officer] line position should support a much, much better performance and understanding at this point." Appellant O'Neill, on the other hand, was terminated after over 30 hours of simulator time, one failed check ride, review on the failed items, and another failed check ride. One of the returning pilots (although not a party to this enforcement proceeding) was accorded nearly 37 hours of simulator time before his training was terminated.

Much of appellants' argument focuses on particular individuals who, throughout the history of Northwest, received more training time than they did. However, we do not believe that such evidence required the district court to find that Northwest failed to give either its usual and customary training or its best efforts. As we have noted, the testimony showed that each trainee was considered as an individual. There was testimony that any trainee might be terminated if the Pilot Review Board determined that his progress was unsatisfactory. The bare fact of more or less time for any individual trainee shows little or nothing about either Northwest's usual and customary training or its best efforts. It certainly does not provide us with a basis for holding that the district court clearly erred.

■ Nor do we believe that any of the district court's subsidiary findings is clearly erroneous. The defendant also offered evidence that it provided a special program for the appellants. In particular it provided extra instruction in gross weights and flow patterns and specifically told its instructors that they were to put forth their best efforts. The appellants' training program was specifically devised to provide full instruction in Northwest's general standard operating procedures and the 747 aircraft although appellants should have already been at least generally familiar with both. In part the training program was specially devised of necessity, since Northwest usually hired its 747 Second Officers from the ranks of those already flying other aircraft for it. In such cases, Northwest considered the standard simulator time necessary for such an upgrade to be approximately 14 hours; appellants nearly all received approximately twice this amount of training time. All of these factors gave due regard for appellants' time out of service and the fact that most had not flown in the Second Officer position.

■ Nor do we believe the district court's finding that age played a part in appellants' lack of success in the training program was clearly erroneous. Appellants themselves presented evidence that they had performed satisfactorily in the past, when they were younger. Yet the

evidence reviewed by the district court disclosed that they were performing quite poorly in their training under the consent decree. Having credited the testimony of the company instructors, as it was entitled to do, the district court excluded any misbehavior by Northwest as the cause of the failures. Additionally, a Northwest witness testified, in response to a question posed by appellants' counsel on cross-examination, that the failure rate in the training program under the consent decree was "similar" to one experienced by United Airlines in a similar situation. While appellants' expert testified that the rate at United was 8%, compared to the 36% failure rate experienced in Northwest's program, it is undisputed that either failure rate was considerably higher than that Northwest normally experienced with Second Officer trainees. Finally, Northwest's instructors testified that the appellants were having considerable difficulty retaining information that was thought to have been learned in previous sessions. We believe that from all of this evidence, the district court reasonably inferred that age was at least a factor in appellants' failure in the training program.

■ Neither can we take issue with the district court's findings regarding the nature of the Second Officer position. While, it is true, as appellants contend, that Northwest advises its crew members "Do Not Hurry," even in emergencies, this is not necessarily inconsistent with the district court's conclusion that the Second Officer position requires the "ability to think and react quickly." "Hurrying," which implies not only speed but also the absence of caution is not synonymous with "reacting quickly." There was ample testimony and

evidence below that while Second Officers are not to "hurry" through procedures necessary to deal with certain normal and emergency situations, thereby skipping steps, they were required to recognize problems immediately and begin the procedures to respond. We note that the instructor evaluations in appellants' training jackets indicated that they often had trouble with both.

Shorn of appellants' contention that an "arbitrary" time limit was imposed, it is clear that the district court's ultimate findings that Northwest provided its "usual and customary" training and exerted its "best efforts" were not clearly erroneous and were supported by its subsidiary findings which are not themselves clearly erroneous. The instructors and other officials at Northwest testified that the instructors were told to do their best and that the training appellants received was as good or better than any Northwest had ever given. The district court was entitled to and did credit this testimony. As an appellate court, we are not at liberty to overturn this decision.

### IV

■ In sum, we conclude that the district court's interpretation of the consent decree was correct and that his findings that the defendants complied with its terms are both sufficient and not clearly erroneous.[6] Accordingly, the judgment of the district court is

AFFIRMED.

---

6. We also reject appellants' contention that the district court failed to make adequate or correct findings on their allegedly independent claim of a violation of the ADEA. The consent decree in this case required considerably more than the ADEA itself. Therefore, by complying with its terms, Northwest necessarily complied with the ADEA. Additionally, the district court's findings that Northwest provided appellants with the "usual and customary" training (i.e., the same training that it gave everyone else, regardless of age) and exerted its "best efforts" negate any possibility of intentional discrimination

based on age. Appellants' disparate impact claim, based on the high failure rate for persons over age 60, is wide of the mark. It can scarcely be doubted that Northwest's desire that those who operate its airplanes be proficient in their operation is sufficiently "job related" to overcome a disparate impact claim under the facts of this case. We note as well that the presentation of evidence at trial focused primarily, if not exclusively, on whether Northwest had violated the consent decree. As a final matter, we question the propriety of bringing an entirely new age discrimination claim as an adjunct to an

enforcement proceeding under an existing con-
sent decree, without complying with any of the
administrative procedures normally required as
a prerequisite to suit under the ADEA. *See
generally,* 29 U.S.C. § 626.